DENNIS T. et al., Respondents, v JOSEPH C., Appellant.

Second Department, July 20, 1981

APPEARANCES OF COUNSEL

*Joseph O. Giaimo* for appellant.

*William J. Fitzgerald (Edward P. Dean* of counsel), for respondents.

**OPINION OF THE COURT**

MANGANO, J. P.

On this appeal, the specific issue before us is whether a natural mother's consent to the adoption of her child was given pursuant to, and in accordance with, the procedures established by section 115-b of the Domestic Relations Law.

We hold that it was not, and that it was therefore subject to the natural mother's right of unilateral revocation, and her continuing and superior right to the custody of her child.

In the summer of 1980, Lisa, a 16-year-old unwed high school student, discovered she was pregnant. After informing her parents of her condition, she consulted a physician at a local medical group, who confirmed the pregnancy. During this consultation, Lisa, who was accompanied by her mother, had a discussion with the examining physician concerning the possibility of placing her baby for adoption. The physician indicated that inquiries could be made to determine whether any of the medical group's patients were interested in adoption. At a subsequent prenatal visit, another physician at the medical group examined Lisa and discussed the issue of adoption with her mother. This physician informed Lisa's mother that he had a relative who was interested in adopting a baby and that, if agreeable, the relative's lawyer would contact her to pursue the matter. Lisa's mother agreed to this and, soon after, a lawyer contacted Lisa's parents concerning the adoption of their daughter's baby by her clients. A meeting between the lawyer, Lisa and her parents was held at the lawyer's office on October 14, 1980. At that meeting, Lisa signed a printed form entitled "Irrevocable Consent" and captioned as for an adoption proceeding in Surrogate's Court, Queens County. At its signing, the form read as follows:

"I,_____Lisa [last name]_____, residing at_____[Lisa's address]_____ natural (Mother) of_____[blank space for child's first name]_____ [Lisa's last name]_____born_____. I understand that the Consent I am now giving to said adoption is final and irrevocable and that hereinafter I will not be able to regain custody of my (daughter) (son) [blank space for child's first name]_____[Lisa's last name]_____ from (her) or (his) adoptive parents and that I will not be able to maintain an action or proceeding for the return of custody of said child to me.

"[Lisa's signature]

"STATE OF NEW YORK)
COUNTY OF Queens    )  SS.:

"On this_____ . _____ day of_____1980, before me personally came_____Lisa [last name]_____proved to me by the oath of_____[lawyer's name],_____an attorney, admitted to practice in the State of New York to be the person(s) described in and who executed the foregoing instrument, and_____acknowledge that_____ executed the same.

_____
"Surrogate

"I also hereby acknowledge receipt of a conformed copy of this irrevocable consent which was personally delivered to me by_____, Judge of the Surrogate's Court this_____day of_____

_____
"Natural Mother

_____
"Natural Father".·

It is important to note that, when signed by Lisa, the form had not been completely filled in. The first name, date of birth and sex of Lisa's then unborn child had not been entered, nor had a date for Lisa's acknowledgment before a Surrogate of her execution of this instrument. Finally, no Surrogate had signed the instrument as verifying Lisa's acknowledgment of its execution.

On signing the "Irrevocable Consent" at the October 14, 1980 meeting, Lisa was informed by the lawyer for the adoptive parents that "this [the consent form] would be the basis for [the lawyer] to receive that baby at the hospital." The lawyer further stated that this was the form used in Surrogate's Court and said: "[Y]ou have a right to change your mind at any time up to the point you [come before the Surrogate] * * * [Y]ou can even tell the Surrogate that today you are changing your mind and you want this child back."

On November 6, 1980 Lisa gave birth to a male child. On November 9, 1980 the child, with Lisa's consent, was turned over to the lawyer for the prospective adoptive parents by Lisa's mother. The lawyer then delivered the child to her clients, one of whom was the appellant.

On December 19, 1980 the lawyer for the adoptive parents received a telephone call from Lisa, who informed her that she had changed her mind about the adoption and wanted the baby back. The lawyer asked Lisa to put her request in writing, which, apparently, was never done.

On January 8, 1981, Lisa filed an amended petition for a writ of habeas corpus in the Supreme Court, Queens County, seeking the return of her child from the custody of appellant. A writ was issued on January 9, 1981, but was dismissed without prejudice on February 11, 1981. In ordering the dismissal, Special Term concluded that the purpose of the habeas corpus proceeding was to revoke Lisa's consent to the adoption of her son. The court read section 115-b (subd 3, par [a]) of the Domestic Relations Law as requiring that written notice be given to the court in which the adoption proceeding had been or was to be commenced as a condition precedent to instituting such a habeas corpus proceeding. Since the "Irrevocable Consent" form signed by Lisa clearly indicated that the adoption proceeding would be commenced in the Queens County Surrogate's Court, Special Term, before proceeding on the writ application, required that that court be given the proper notice under the statute, which had not as yet been done. Apparently, that notice was given, and, on February 17, 1981, the instant proceeding for a writ of habeas corpus was commenced. The writ was issued the following day, and, after a hearing, was sustained.

We affirm.

"Adoption is the legal proceeding whereby a person takes another person into the relation of child and thereby acquires the rights and incurs the responsibilities of parent in respect of such other person." (Domestic Relations Law, § 110.) It is well settled that adoption was "unknown to the common law of England and exists in the States of the Union solely by force of statutes." *(United States Trust Co. of N. Y. v Hoyt,* 150 App Div 621, 624; see *Betz v Horr,* 276 NY 83, 86-87; *Carpenter v Buffalo Gen. Elec. Co.,* 213 NY 101, 104; *Matter of MacRae,* 189 NY 142, 143; *Matter of Thorne,* 155 NY 140, 143; *Matter of Landon v Motorola, Inc.,* 38 AD2d 18, 20.)

In New York, article 7 of the Domestic Relations Law establishes the right of adoption, defines the persons who may adopt and prescribes the procedures to be followed. No person shall be adopted except in pursuance of this article (Domestic Relations Law, § 110), and its provisions are to be strictly construed. *(Matter of Santacose,* 271 App Div 11, 16; see *Matter of Landon v Motorola, Inc., supra,* p 20.). Strict construction is required by the rules governing the interpretation of statutes in derogation of the common law. (McKinney's Cons Laws of NY, Book 1, Statutes, § 311; *Matter of Ryan,* 291 NY 376, 400.) Also, and more importantly, it is required by the delicate and definitive nature of the adoption proceeding, which fundamentally touches and radically alters the lives of all concerned. Precise and exacting compliance with the procedures mandated by article 7 of the Domestic Relations Law is imperative. This is especially true for article 7's adoption consent procedures, which permit, and carefully safeguard, the process of informed decision-making. The integrity of this process is an absolute necessity because of the finality of adoption, the psychological and emotional needs of the parties, and the best interest of the child.

In the case at bar, the prospective adoption of the subject child was a private-placement adoption (see Domestic Relations Law, § 109, subd 5). Special provisions relating to consents in such adoptions can be found in section 115-b of the Domestic Relations Law. Subdivision 1 of that section reads:

"1. If a duly executed and acknowledged consent to a private-placement adoption shall so recite, no action or proceeding may be maintained by the consenting parent for the custody of the child to be adopted, and no such consent shall be revoked by such parent if:

"(a) The consent sets forth the name and address of the court in which the adoption proceeding is to be commenced; and

"(b) A copy of such consent was given to such parent upon the execution thereof; and

"(c) The consent was executed or acknowledged before a judge or surrogate of the court in which the adoption pro-

ceeding is to be commenced and such consent states that it shall become irrevocable upon such execution or acknowledgment; or

"(d) The consent was not executed or acknowledged before a judge or surrogate of the court in which the adoption proceeding is to be commenced, in which case,

"(i) Such consent shall, if it shall so state, become irrevocable thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall have been received by the court within said thirty days.

"(ii) Notwithstanding that such written notice shall have been received within said thirty days, the notice of revocation shall be given effect only if the adoptive parents fail to oppose such revocation, as provided in subdivision three of this section, or, if they oppose such revocation and the court as provided in subdivision three of this section shall have determined that the best interests of the child will be promoted by giving force and effect to such revocation."

The statute speaks in terms of two types of consent. The first is a "judicial consent", which becomes irrevocable when executed or acknowledged *before a Judge or Surrogate of the court in which the adoption proceeding has been, or is to be,* commenced (Domestic Relations Law, § 115-b, subd 1, par [c]). The second type is an "extra-judicial consent", which is not executed or acknowledged before a Judge or Surrogate, and only becomes irrevocable 30 days after the commencement of the adoption proceeding, if it shall so state (Domestic Relations Law, § 115-b, subd 1, par [d], cl [i]).

If an "extra-judicial consent" is given, the natural parent may, before the expiration of 30 days after the commencement of the adoption proceeding, file a notice of revocation of consent with the adoption court. If the adoptive parents fail to oppose said revocation, it shall be given full force and effect. (Domestic Relations Law, § 115-b, subd 1, par [d], cl [ii].) If the adoptive parents give notice of their intention to oppose the revocation, the adoption court shall conduct a hearing and take proof "as to whether the best interests of the child will be promoted by the return of the child to the parents, or by the adoption of the child by

the adoptive parents, or by placement of the child with an authorized agency for foster care with or without authority to consent to the adoption of the child, or by other disposition of the custody of the child." (Domestic Relations Law, § 115-b, subd 3, par [d], cl [ii].) It is critical to understand that, at the hearing to determine whether a revocation of an *"extra-judicial consent"* should be permitted, "the parent or parents who consented to such adoption shall have no right to the custody of the child superior to that of the adoptive parents, notwithstanding that the parent or parents who consented to the adoption are fit, competent and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition." (Domestic Relations Law, § 115-b, subd 3, par [d], cl [v].)

It is also critical to understand, and important to emphasize, that subdivision 3 of section 115-b of the Domestic Relations Law only applies when there is an attempt to revoke an "extra-judicial consent", as defined by paragraph (d) of subdivision 1 of that section. The single-issue revocation hearing of subdivision 3, i.e., the best interests hearing, is not authorized under any other circumstances.

In this case, the natural mother executed an adoption consent form out of court. Although entitled an "Irrevocable Consent", it was not the form for an irrevocable "extra-judicial consent" required by the statute. It contained no warning that it would become irrevocable 30 days after the commencement of the adoption proceeding unless written notice of revocation thereof was received by the court within said 30 days (Domestic Relations Law, § 115-b, subd 1, par [d], cl [i]). Instead, the form used was a "judicial consent" (Domestic Relations Law, § 115-b, subd 1, par [c]), executed out of court by the natural mother, and clearly intended to be acknowledged by her before the Queens County Surrogate, as would have been required by the Domestic Relations Law (§ 115-b, subd 1, par [c]) in order to render the consent final and irrevocable. At best, then, the form signed by the natural mother was an incomplete

"judicial consent" to adoption, or a preliminary consent to adoption, or a private agreement by the natural mother to transfer the subject child's custody pending final consent to adoption.[1]

Whatever we may label the consent given in this case, it is clear that it did not conform to either of the two statutorily prescribed methods for effecting an irrevocable consent to adoption. The natural mother, therefore, retained the right unilaterally to revoke her consent. (See *Matter of Male M.*, 76 AD2d 839, mot for lv to app den 50 NY2d 1056.)

The issue then becomes one of determining the custody of the subject child after the revocation of the natural mother's nonstatutory consent to adoption, and of choosing the appropriate criteria for deciding this issue in any custody proceeding subsequent to the revocation. We are guided in these considerations by the common-law principles enunciated in *Matter of Bennett v Jeffreys* (40 NY2d 543, 548) wherein the Court of Appeals stated:

"[N]either decisional rule nor statute can displace a fit parent because someone else could do a 'better job' of raising the child in the view of the court (or the Legislature), so long as the parent or parents have not forfeited their 'rights' by surrender, abandonment, unfitness, persisting neglect or other extraordinary circumstance. These 'rights' are not so much 'rights', but responsibilities which reflect the view, noted earlier, that, except when disqualified or displaced by extraordinary circumstances, parents are generally best qualified to care for their own children and therefore entitled to do so *(Matter of Spence-Chapin Adoption Serv. v Polk*, 29 NY2d 196, 204, *supra) * * *

"But where there is warrant to consider displacement of the parent, a determination that extraordinary circumstances exist is only the beginning, not the end, of judicial inquiry. Extraordinary circumstances alone do not justify depriving a natural parent of the custody of a child. Instead, once extraordinary circumstances are found, the court must

1. In fact, the natural mother was given to understand by the lawyer for the adoptive parents that the consent form she had signed was simply for the purpose of the lawyer gaining custody of the child at the hospital.

then make the disposition that is in the best interest of the child." In other words, if a nonparent would defeat a natural parent's right to the custody of the child, he must sustain the twofold burden of establishing (1) extraordinary circumstances, e.g., that the natural parent is unfit, or that he has abandoned, neglected or surrendered his child, *and* (2) that an award of custody to the nonparent would be in the child's best interest. *(Matter of Corey L v Martin L,* 45 NY2d 383, 391; *Matter of Bennett v Jeffreys, supra,* pp 548-549; *People ex rel. Scarpetta v Spence-Chapin Adoption Serv.,* 28 NY2d 185, 193; *Matter of Male M.,* 76 AD2d 839, *supra.)*

On this record, there is no proof of abandonment, neglect or unfitness, or other extraordinary circumstances such as those found in *Matter of Bennett v Jeffreys (supra),* viz., a protracted separation of parent and child for eight years. Nevertheless, it cannot be denied that the subject child was surrendered for adoption. Was the surrender in this case, however, of such a type that proof thereof would have sustained the first element (i.e., extraordinary circumstances) of the appellant nonparent's twofold burden on the issue of custody, so as to warrant further inquiry into the child's best interest? We answer this in the negative.

The surrender herein was not to an authorized agency for adoption, pursuant to section 384 of the Social Services Law, and to that extent the natural mother's presumptive right to custody was not affected by subdivision 5 of section 383 of the Social Services Law.[2] Additionally, and more to the point, the subject child was not surrendered to an individual for adoption pursuant to the "extra-judicial consent" procedures of section 115-b of the Domestic Relations Law. Thus, as already explained *(supra,* pp 131-132) a best

2. That subdivision provides: "In an action or proceeding to determine the custody of a child surrendered for adoption and placed in an adoptive home or to revoke or annul a surrender instrument in the case of a child placed in an adoptive home, the parent or parents who surrendered such child shall have no right to the custody of such child superior to that of the adoptive parents, notwithstanding that the parent or parents who surrendered the child are fit, competent and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely .on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition."

interest revocation hearing was not authorized. Furthermore, section 115-b (subd 3, par [d], cl [v]) of the Domestic Relations Law, which is virtually identical to subdivision 5 of section 383 of the Social Services Law in its abrogation of a natural parent's presumptive right to the custody of his child, did not apply. Consequently, even though there was a surrender of the subject child for the purpose of adoption, it was not one of the two types prescribed by statute (see Social Services Law, § 384; Domestic Relations Law, § 115-b, subd 1, par [d]), and was, thus, not a surrender which, by express statutory language, would have operated to nullify the natural mother's superior right to the custody of her child. Therefore, since the relevant statutes only allow for two situations in which a surrender for adoption will prevent a natural parent from asserting a presumptive right to the custody of his child in any subsequent custody proceeding, then any surrender other than those contemplated by the statutes must be viewed as not affecting the superior custodial right of the natural parent. This result is dictated by the principle enunciated in the maxim *expressio unius est exclusio alterius,* i.e., "where as here the statute described the particular situations in which it is to apply, 'an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded' (McKinney's Cons Laws of NY, Book 1, Statutes, § 240)." *(Patrolmen's Benevolent Assn. of City of N. Y. v City of New York,* 41 NY2d 205, 208-209.)

Hence, in the case at bar, there having been no proof of abandonment, neglect or unfitness, nor proof of a surrender under section 384 of the Social Services Law or section 115-b (subd 1, par [d]) of the Domestic Relations Law, or other like extraordinary circumstances, the natural mother's superior right to the care and custody of her child was properly sustained by the habeas court, which was constrained not to proceed to inquire further into the best interest of the child, nor to order a custodial disposition solely on that ground.[3] *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 549, supra.)

---

3. That is, the habeas court could not have based its custodial disposition on the *independent* ground of the child's best interest. This is not to say, how-

Accordingly, the judgment at Special Term should be affirmed.

GIBBONS, RABIN and MARGETT, JJ., concur.

Judgment of the Supreme Court, Queens County, dated May 21, 1981, affirmed, without costs or disbursements.

ever, that this interest was ignored since it is the generally accepted view that it is in the child's best interest to be raised by his parent unless the parent is disqualified by gross misconduct. *(Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204, supra.)*