STATE OF NEW YORK ex rel. MAUREEN M. DUNN, on Behalf of BABY GIRL DUNN, Appellant, v CATHOLIC HOME BUREAU FOR DEPENDENT CHILDREN et al., Respondents.

First Department, February 26, 1987

### APPEARANCES OF COUNSEL

*Terry Milburn* of counsel *(Milburn & Ackerman,* attorneys), for appellant.

*Frederick J. Magovern (John A. Newbery* with him on the brief), for Catholic Home Bureau for Dependent Children, respondent.

*Stanley B. Michelman, P. C.,* for John Doe and another, respondents.

### OPINION OF THE COURT

Asch, J.

In the summer of 1985, petitioner, then working at a restaurant in Cape Cod, Massachusetts, discovered that she was pregnant. In February of 1986, she went to New York City to obtain medical care as well as a place to live while awaiting the birth of her child. Petitioner was unmarried, aged 27, and a college graduate with a major in English. Following her graduation, she worked as a waitress and assistant manager at the restaurant in Cape Cod. The father of the child is a married man, with two children, who worked at the same restaurant.

Petitioner conceded that during the time she was working in the restaurant, she used some drugs. However, her testimony was that once she found out she was pregnant, she became concerned and frightened and worried about the consequences of drug use and gave them up completely. She claims that at the present time she never uses drugs, and drinks no more than an occasional glass of wine with dinner.

Upon moving to New York City, petitioner found temporary lodgings with a former co-worker in the home of the co-worker's parents on Long Island. To avoid being a burden on her friend, not wishing to ask her parents or the father of the child for money, and being in dire straits psychologically, the petitioner turned in desperation to respondent, the Catholic Home Bureau. An interview was arranged with Sister Rosalie Gilson, a social worker for that agency, on February 26, 1986.

At their meeting, petitioner told Sister Rosalie of her need for help and a place to live while waiting for the birth of her child. She also confided that she was uncertain as to whether to give up the child for adoption.

Sister Rosalie asked the petitioner to fill out certain forms covering her own history and that of the father. She also gave petitioner the names of three homes where she might find temporary abode during her pregnancy, as well as material concerning adoption. Sister Rosalie warned petitioner that if she decided to keep her child, she would be obligated to pay all of her medical bills in addition to $125 a week for shelter. If she gave up her baby, these charges would be forgiven. The Sister also reviewed the procedure which would follow if petitioner gave the child up for adoption and reviewed the formal surrender papers with the petitioner. Significantly, she assured petitioner that she had a 30-day period to change her mind even after signing the papers.

Following this interview, on March 4, 1986, petitioner went to stay at the Nazareth Life Center, one of the recommended homes. She lived there until April 16, 1986, except for her hospitalization to give birth on April 6, 1986. Cathy Howard, a social worker from the agency, had a number of discussions at Nazareth with petitioner before the baby was born. During these meetings, petitioner told Ms. Howard that she was uncertain about placing her baby for adoption.

During her direct examination, Ms. Howard resorted to notes which she testified contained significant information allegedly copied from a notebook. Ms. Howard was directed by the court to produce the notebook. When she did so, significantly enough, it contained nothing relating to petitioner. On her cross-examination, the social worker conceded that the petitioner had been ambivalent with respect to adoption and had confessed to her that she didn't know exactly what she wanted to do. Ms. Howard acknowledged also that she had never told the petitioner that an option might exist to place the child in a foster home; had never advised petitioner that she could have counseling; and, had never suggested to her that it would be wise, or at least that she had the opportunity, to talk to a lawyer.

The traumatic day before the petitioner gave birth, petitioner agreed that she would surrender the child for foster care. The very next day, April 6th, she gave birth and the following day, also a day fraught with emotion, Ms. Howard

visited her at the hospital to obtain her consent to place the child with the agency. Just a few days later, on April 10th, the child was placed by the agency with Mr. and Mrs. "Doe" pursuant to a written agreement which did nothing more than give them the option of applying to adopt the infant when the child was "legally freed" for such adoption. Significantly, the Does stated in this agreement that they were "fully aware that this child is not freed at this time and agree to return * * * her to the Catholic Home Bureau in the event the natural mother requests this agency to return the child to her care before termination of her legal rights".

On April 16, 1986, petitioner went back to her family in Massachusetts. She advised them that she still didn't know what to do. They said that they would help her and support her decision no matter what decision she made.

On April 23, 1986, petitioner returned to New York and met with Cathy Howard. She told Ms. Howard that she would not sign the surrender papers authorizing adoption because she was undecided as to what to do and that she felt she needed counseling. Petitioner then called Sister Rosalie, who furnished her with the names of two counselors. She met with one on April 26, 1986. However, on the very same day, Sister Rosalie pressed her as to whether she had made a decision. Petitioner responded that she still needed more time and made a second counseling appointment. She saw the counselor again on April 30, 1985. That evening, after the petitioner's session with the counselor, Sister Rosalie called her and accused her of stalling in signing the papers. The petitioner yielded and agreed, provided that she had 30 days within which to change her mind. She was again reassured by Sister Rosalie that she had 30 days to revoke her surrender. They met on May 1st at a busy Friendly's coffee shop or restaurant, as arranged by Sister Rosalie. During two hours together, Sister Rosalie told petitioner about the people who were interested in the baby. They also discussed the petitioner's family, the father of the child, and so on. Sister Rosalie reviewed the surrender procedure including the surrender papers, but she also emphasized the fact that the petitioner had 30 days to revoke her consent to any adoption. It is noteworthy that the trial court, relying on the contents of her pretrial deposition, formally concluded in its opinion "at the very least" Sister Rosalie's "credibility on this issue was impeached".

Petitioner went to Massachusetts, met with her family, and

made arrangements for living there. On May 20, 1986, she called Louise Shaw of the agency. Petitioner advised her that she wanted her child returned. Ms. Shaw said that she would telephone the Does and tell them what petitioner had decided. The next day Ms. Shaw advised petitioner that she had spoken to Mrs. Doe but still had to speak to Mr. Doe. Not having received any word, petitioner called Ms. Shaw that afternoon. She then was told that the Does refused to return the child. Ms. Shaw suggested the petitioner write a letter to the agency formally requesting the return of her baby. Petitioner immediately complied but the agency did not respond to the letter nor did it contact her. Petitioner sent a second letter making the same request, but again the agency did not answer. Thereupon, the writ of habeas corpus was sought. It was only after the habeas corpus proceeding was initiated that the surrender papers were for the first time formally acknowledged by the witness, Sister Rosalie, as required by law. This had not been done before. It is also conceded that the surrender papers had not been recorded in the office of the County Clerk. Further, the names of the Does as "adoptive parents" were not recorded in the agency's bound volume until May 27, 1986, after the surrender had been revoked by petitioner.

The record clearly shows many representations to the petitioner that she had a 30-day period after she signed the surrender document to change her mind. Although petitioner signed the surrender papers, even at that time she advised the Sister that she was not sure of her decision. She was going back to see her family and talk to her brother about a place to live and testified that "I told Sr. Rosalie I wasn't sure about my decision, that I was going back to talk to my brother about living with him." While the respondents argue to the contrary, it is fairly certain that on May 1, 1986, Sister Rosalie and the petitioner did have a discussion about her right to change her mind. Thus, Sister Rosalie testified at the examination before trial, *inter alia:*

"Question: Did you discuss with Maureen that she can change her mind in thirty days?

"Answer: I did.

"Question: Did you discuss this on May 1st?

"Answer: Yes."

It is also clear, on the basis of the record, that as a result of her discussion with Sister Rosalie, the petitioner could have reasonably believed that she could get her baby back automat-

ically if she changed her mind. Sister Rosalie testified as follows:

"Q Sr. Rosalie, is it not a fact that when you first met her, did you tell her that if she signed a Surrender, she would have thirty days to change her mind?

"A I did.

"Q And did you tell her that if she signed the Surrender and changed her mind, she would get her baby back?

"A I did."

As additional confirmation of the reasonableness of petitioner's belief, it is noteworthy that the respondent Catholic Home Bureau actually did ask the Does to return the child, which request was refused by the Does. Petitioner finally signed the surrender on May 1, 1986, at a restaurant where she had met with Sister Rosalie. The Sister at that time stated that she expected to hear from petitioner at the end of the month of May as to whether she wanted the child back.

This court is persuaded that on the basis of what the law requires, and fundamental human considerations, the action of the trial court (133 Misc 2d 399) must be set aside. There was a substantial failure on the part of the respondent agency to follow the statutory requirements for a valid surrender. Consequently, the trial court erroneously and incorrectly characterized the Does as adoptive parents. If the court could properly overlook the failure of the agency to comply with the statutory requirements, under the governing law the limited issue before it was to evaluate the fitness of the petitioner, not the "best interests" of the child. Hence, there was no justification for the court to view this as a "best interest" hearing, pitting the petitioner as a parent against the Does.

Even accepting the view that what we are considering is no more than a bare bones contract, the surrender agreement cannot withstand the factual features of estoppel or duress or even perhaps fraud which are suggested by the circumstances herein presented.

The respondent agency neglected to comply with a number of requirements imposed by statute as a precondition to a valid surrender. These deficiencies alone compel this court to vitiate the surrender.

Social Services Law § 384 (3) requires, *inter alia:* "The instrument herein provided shall be signed and shall be (a) acknowledged or (b) executed in the presence of one or more witnesses and acknowledged by such witness or witnesses, in

either case before a notary public or other officer authorized to take proof of deeds, and shall be recorded in the office of the county clerk in the county where such instrument is executed, or where the principal office of such authorized agency is located".

The surrender document was signed by petitioner on May 1, 1986. By May 20, 1986, the petitioner notified the agency, both by telephone and mail, that she wished to revoke her consent and that she wanted the infant returned to her. As of that date, the instrument had not been acknowledged nor had it been recorded in the office of the County Clerk, as required by Social Services Law § 384 (3).

It is axiomatic that there must be strict construction of statutes in derogation of the common law such as section 384. "Also, and more importantly, it [strict construction] is required by the delicate and definitive nature of the adoption proceeding, which fundamentally touches and radically alters the lives of all concerned. Precise and exacting compliance with the procedures mandated * * * is imperative." *(Dennis T. v Joseph C.,* 82 AD2d 125, 129.) This is especially true under the circumstances herein, where the proper execution and filing of a form of surrender pursuant to the statute will substitute a "best interests of the child" test for the presumption that a natural parent will not be deprived of custody unless she or he is established by clear and convincing proof to be unfit or unable to properly care for a child (Social Services Law § 383 [6], formerly § 383 [5]).

We are concerned here not with technicalities, but with procedural requirements which were created by the Legislature in order to ensure that the most critical of human relationships, mother and child, would not be easily abrogated.

Even if these statutory procedures had been complied with by the agency, the agency failed to adhere to the requirement of the statute set out in section 384 (5), which provides, in pertinent part: "For the purposes of this subdivision, no child shall be deemed to have been placed in the home of adoptive parents unless the fact of such placement, the date thereof, the date of the agreement pertaining thereto and the names and addresses of the adoptive parents shall have been recorded in a bound volume maintained by the agency for the purpose of recording such information in chronological order." The entry concerning the Does, in the bound record of the

Catholic Home Bureau, was not made until May 27, 1986. This was seven days after the revocation of the surrender and, obviously was inserted in response to that revocation. The mandatory nature of the recording requirement has been emphasized. *(See, Matter of "Baby Boy P.",* 85 Misc 2d 1001; *Matter of Danielson,* 104 Misc 2d 33.) In the case before us, the agency failed to satisfy these statutory procedures and the child was never placed in the home of "adoptive parents" within the meaning of the statute. Hence, Mr. and Mrs. Doe never achieved the status of "adoptive parents". Application by the court of the strict "best interests of the child" test in Social Services Law § 383 (6) was, therefore, erroneous under these circumstances.

The trial court erred in regarding the Does as "adoptive parents" and conducting a "best interests" hearing between petitioner and the Does and then awarding custody to the Does. The custody issue was only between the petitioner and the agency and not the petitioner and the Does, since the Does only had physical custody of the child as agents of the agency to which they improperly refused to return the child. In any event, adoption proceedings were pending in Surrogate's Court at the time of this hearing and it was erroneous for the Supreme Court to make a judgment as to the appropriateness of an adoption by the Does while the adoption was *sub judice* in the Surrogate's Court.

The confusion of the trial court is based on its invocation of section 383 (5) (now § 383 [6]) of the Social Services Law, which reads as follows: "In an action or proceeding to determine the custody of a child surrendered for adoption *and placed in an adoptive home or* to revoke or annul a surrender instrument *in the case of a child placed in an adoptive home,* the parent * * * who surrendered such child shall have no right to the custody of such child superior to that of the adoptive parents, notwithstanding that the parent * * * who surrendered the child [is] fit, competent and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition." (Emphasis supplied.)

Since the child was *not* "placed in an adoptive home" in compliance with section 383 (5), this section was inapplicable and the court should have resorted to basic common-law principles, i.e., that a biological parent has "a right to the care

and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood" *(People ex rel. Kropp v Shepsky,* 305 NY 465, 468). In the absence of surrender, abandonment, persistent neglect, unfitness or other like "extraordinary circumstances", the biological parent may not be denied custody *(Matter of Bennett v Jeffreys,* 40 NY2d 543). The Court of Appeals, furthermore, has reiterated the applicable law as follows: "The State may not deprive a natural parent of her child's custody merely because a court or social agency believes it can decide more wisely than the parent or believes it has found someone to better raise the child. So long as the parental rights have not been forfeited by gross misconduct *(Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 204; see *Matter of Gustow,* 220 NY 373, 377) or other behavior evincing utter indifference and irresponsibility (see, e.g., *Matter of Cleaves,* 6 AD2d 138), the natural parent may not be supplanted (see *Stanley v Illinois,* 405 US 645, 651). Indeed, even where such 'forfeiture' or 'extraordinary circumstances' are found to exist, the best interests of the child must still thereafter be determined before the natural parent may be displaced. *(Matter of Bennett v Jeffreys, supra,* at p 548.) Otherwise, the question of best interests is not even reached. *(Matter of Merritt v Way,* 58 NY2d 850.) For once it is found that the parent is fit, and has neither abandoned, surrendered, nor otherwise forfeited parental rights, the inquiry ends and the natural parent may not be deprived the custody of his or her child." *(Matter of Infant L.,* 61 NY2d 420, 427.)

Here, the record as we have detailed above did not clearly show that petitioner was unfit to assume the duties of parenthood. The evidence was to the contrary. The petitioner had worked out an arrangement to live with her brother and his wife. Furthermore, support would be coming from her family and from the father of the child. She herself was educated, serious about her responsibilities and gainfully employed.

If this court were required to decide on the validity of a commercial contract for the sale of goods, the agreement would face serious challenge on theories of estoppel or duress or fraud under the facts as herein presented. It is incredible, under the circumstances revealed by the record, that petitioner should be denied her child. The agency's representatives did not comply with essential statutory requirements, the petitioner asserted her parental rights well before the expiration of the 30-day period for so doing, the petitioner was

subjected to extraordinary pressure to surrender her child at the most traumatic time of her life by those in whom she had reposed utmost confidence, and there is ample reason to believe that petitioner will be a good mother.

Accordingly, the judgment (denominated an order) of the Supreme Court, New York County (Harold Baer, Jr., J.), entered July 18, 1986, which denied petitioner's petition for a writ of habeas corpus for the custody of her daughter "Baby Girl" D. and awarded custody to the adoptive parents, should be reversed, on the law and facts, the petition granted and custody awarded to petitioner, without costs or disbursements.

MURPHY, P. J., CARRO, MILONAS and ROSENBERGER, JJ., concur.

Judgment (denominated an order), Supreme Court, New York County, entered on or about July 18, 1986, unanimously reversed, on the law and facts, the petition granted and custody awarded to petitioner, without costs and without disbursements.