OPINION OF THE COURT
Paul Crapsi, J.
In this private placement adoption proceeding, the birth mother (Jill) seeks to prevent the adoption of her son (Jarrett) by attacking the validity of her extrajudicial consent, given four days postpartum, withdrawn four days later, and never filed in its original form with the court.
BACKGROUND AND PRIOR PROCEEDINGS
During a brief but stormy relationship with Steven, Jill became pregnant. They separated in late August 1994, follow *628 ing a domestic altercation and before Steven was aware of Jill’s pregnancy. Once Jill discovered her condition, she decided to place the baby for adoption.
On February 14, 1995, Jill used an 800 number to contact the adoptive parents (Karen and Dennis) in response to an advertisement placed in a local newspaper. Karen and Dennis were interested in adopting a child, and Jill indicated an interest in placing her unborn child for adoption.
Also on February 14, and again on February 16, Jill called Flory Herman, Esq., attorney for the adoptive parents. Ms. Herman offered to provide Jill with legal counsel at her clients’ expense. Ms. Herman suggested Kurt Mulzet, Esq., of Pittsburgh, Pennsylvania. Although she spoke to Mr. Mulzet by phone, Jill dealt primarily with Elizabeth Lacy, Esq., an attorney associated with Mr. Mulzet.
Following their separation in August 1994, there was no contact between Steven and Jill until shortly before Jill gave birth to Jarrett. Approximately two weeks prior to the birth, Steven visited at Jill’s apartment for several hours. The testimony of Jill and Steven was consistent in describing this visit, and both testified that Jill remained on a couch the entire time, covered to her chest with a blanket.
Jill gave birth on April 6 in Westmoreland Regional Hospital, Greensburg, Pennsylvania. Following the birth, Jill had her first meeting with Karen and Dennis at the hospital, and they agreed on the baby’s name. She returned home later that night.
On April 10, 1995 Jill executed several documents, including an agreement of adoption, extrajudicial consent and a waiver of rights and acknowledgment of counsel. The consent included a signature line for a Judge, and Jill was advised that she would later appear before a Judge in Pennsylvania to acknowledge her consent.
A copy of the consent was submitted to the Interstate Compact on the Placement of Children (ICPC) in both Pennsylvania (62 Pa Cons Stat §§ 761-765) and New York (Social Services Law § 374-a). The adoptive parents were thus able to return to New York with Jarrett, who has remained with them to the present time.
The following day (Apr. 11), Jill again entered the hospital, where a tubal ligation was performed. She returned home the same day. On April 12, Steven received notice of the adoption and immediately called Jill. He went to her apartment and *629 during the ensuing discussion, expressed his opposition to the adoption and his willingness to take custody of the baby.
A petition for adoption was filed in this court on April 13, 1995. A copy of Jill’s consent was filed with the adoption petition. The original consent, as well as all other documents signed by her on April 10, remained in the hands of her Pennsylvania counsel.
On Friday, April 14, Jill called Elizabeth Lacy to advise her that she had changed her mind and wanted Jarrett returned. On April 17, Jill placed another call to her. Ms. Lacy advised Jill that Karen and Dennis would not return Jarrett and further that she would be unable to continue representing her. Within a matter of days, the Court of Common Pleas of Westmoreland County, Pennsylvania, appointed Richard J. Baumgardner, Esq. to represent Jill.
Jill mailed a letter to this court, dated April 14, 1995, revoking her consent to the adoption. It was received on April 24, 1995. A formal notice of revocation, prepared by Mr. Baumgardner and dated April 20, was also received on April 24. The adoptive parents filed a notice of intent to contest Jill’s revocation on April 27, 1995.
On April 26, an action was commenced by Jill and Steven in the Court of Common Pleas of Westmoreland County, Pennsylvania, seeking custody of Jarrett. The Pennsylvania court awarded temporary custody to plaintiffs, Jill and Steven. A further order was issued by the Pennsylvania court on August 25, granting custody of Jarrett to Steven and Jill and setting a trial date of December 7, 1995.
This court granted temporary guardianship of Jarrett to the adoptive parents on May 2, 1995. On May 5, John Brenon, Esq. was appointed Law Guardian for Jarrett.
Both Jill and Steven moved to dismiss the petition. The court denied the motion as to Jill, and reserved decision as to Steven, pending a determination of his status as a consent father or notice father. A motion for summary judgment was filed by Jill on July 5 and the adoptive parents filed a cross motion for the same relief on July 19. The court reserved decision pending a hearing.
The original consent was produced at the hearing, pursuant to discovery demands by the adoptive parents. It has not, however, been filed with the court, nor have any original documents signed by Jill on April 10.
*630 HEARING
A hearing was conducted on August 29, 30, 31 and September 1,1995. Two issues were addressed: the validity of Jill’s consent to the adoption and the status of the birth father. With respect to the former, it was stipulated that a consent to the adoption was executed by Jill on April 10, 1995, and further that a revocation of the consent in proper form was duly filed within the time prescribed by the statute.
On September 5, summations were heard and the Law Guardian was called upon for his recommendation. The Law Guardian expressed some skepticism as to whether this court could properly exercise jurisdiction over the birth father. As Jarrett’s attorney, he was concerned that "any award be legally secure, not unassailable perhaps, but secure”. He concluded by recommending against the adoption because of the numerous uncertainties surrounding the proceeding. He opined that while undoubtedly the adoptive parents could provide a suitable home for Jarrett, it would be better to have him returned to his birth parents at this time, rather than several years from now, following a protracted appeals process.
The Birth Mother’s Consent
The next issue for determination is the validity of the birth mother’s consent. In this regard, there was argument as to whether the birth mother’s original consent must be filed or merely presented to the court. Article 7 of the Domestic Relations Law governs adoption in New York, prescribes the procedures to be followed and provides that no person shall be adopted except in pursuance thereof. (Domestic Relations Law § 110.) The essential documents are set forth in Domestic Relations Law § 112 (2), which provides, in pertinent part: "The adoptive parents * * * must present to such judge or surrogate (a) a petition * * * (b) an agreement on the part of the adoptive parents * * * to adopt and treat the adoptive child as their * * * own lawful child; (c) the consents required by section one hundred eleven of this article.” (Emphasis added.)
Jill’s consent would be required by Domestic Relations Law § 111 (1) (c). The adoptive parents argue that since the statute requires them to "present” the petition, agreement and consents, the birth mother’s original consent need not be filed with the court. They contend that filing a certified copy of the consent satisfies the statute, since the original consent was "presented” at the hearing in the form of exhibit 37.
The statute, however, is not altogether clear on this point. Domestic Relations Law § 115-b (5) provides: "For the purposes *631 of commencing an adoption proceeding, the clerk of a court of competent jurisdiction shall accept an adoption petition for filing which is complete on its face and shall not require any supplementary documentation as a condition of filing. Nothing in this section shall compel a court to hear an adoption petition until all documents necessary to the adoption proceeding have been filed to the satisfaction of the court.” (Emphasis added.)
This section clearly refers to filing the adoption petition and "all documents necessary to the adoption proceeding”. The birth mother’s consent would be one of the "necessary” documents. (Domestic Relations Law § 111 [1] [c].) Thus, Domestic Relations Law § 115-b (5) requires a filing of the required consents "to the satisfaction of the court”. Initially, this court takes judicial notice of the fact that it has always required original consents to be filed in adoption proceedings, and has never approved an adoption in the absence of an original consent filed with the court.
In addition to the Domestic Relations Law, and pursuant thereto, the Chief Administrator of the Courts has promulgated uniform rules for the New York State trial courts, including the Family Court: 22 NYCRR part 205 (Uniform Rules for Family Court [Family Court Rules or Rules]).
The terms "present” (22 NYCRR 205.8), "submit” (22 NYCRR 205.8, 205.53 [a]), "file” (22 NYCRR 205.8, 205.53 [c]; 205.55, 205.57, 205.58 [b]) and "submit and file” (22 NYCRR 205.53 [b]) are used throughout the Family Court Rules. Rule 205.8 is illustrative, using the terms "present”, "submit” and "file” within one rule:
"Submission of Papers to Judge
"All papers for signature or consideration of the court shall be presented to the clerk of the court * * * except that when the clerk is unavailable or the judge so directs, papers may be submitted to the judge and a copy filed with the clerk * * * All papers for any judge which are filed in the clerk’s office shall be promptly delivered to the judge by the clerk. The papers shall * * * prominently show the * * * docket number of the proceeding in which they are filed” (22 NYCRR 205.8 [emphasis added]).
Rule 205.8 refers to "all papers” being "presented” to the clerk, presumably for "filing”, since the papers are then referred to as having been "filed”. This comports with the customary practice in this court; all papers are ordinarily "submitted” or "presented” to the clerk, who then files them.
*632 Rule 205.55 also contemplates a filing of the adoption petition, and by implication, the other required documents, including the required consents: "All applications, including applications to dispense with * * * the period of waiting after filing of the adoption petition, shall be made in writing” (22 NYCRR 205.55 [emphasis added]).
The Rules clearly contemplate the filing of the adoption petition and "supporting documents” in certain agency adoptions related to termination of parental rights proceedings (22 NYCRR 205.52 [b]). They also contemplate the filing of petitions for temporary guardianship by the adoptive parents (22 NYCRR 205.57) and mandate the filing of preplacement investigations (22 NYCRR 205.58).
These statutory provisions and the Family Court Rules are in pari materia and must be construed together. (McKinney’s Cons Laws of NY, Book 1, Statutes § 221 [a], [b]; Domestic Relations Law § 112-a [2], [3].) In addition to construing the statutes and Rules together to ascertain intent, general rules of construction provide guidance.
"Whenever there is a general and a particular provision in the same statute, the general does not overrule the particular, but applies only where the particular enactment is inapplicable.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 238.) In the case of adoption statutes and Rules, the particular provision ("file”) would prevail over the general provisions ("present”, "submit”).
Moreover, "an explicit statement in a later statute may even control general language of an earlier enactment.” (Id., at 405.) Here, the later statute, Domestic Relations Law § 115-b (5) (L 1972) refers to "filing”, and controls the earlier statute Domestic Relations Law § 112 (L 1938), which refers to "presenting” the petition and related documents.
Adoption was unknown to English common law and exists only by statute. (Matter of Malpica-Orsini, 36 NY2d 568, 570 [1975].) Adoption in New York is "solely the creature of, and regulated by, statute law.” (Matter of Eaton, 305 NY 162, 165 [1953].) Since adoption statutes are in derogation of the common law, they must be strictly construed. (McKinney’s Cons Laws of NY, Book 1, Statutes § 301; Betz v Horr, 250 App Div 457 [2d Dept 1937], revd on other grounds 276 NY 83.)
The rule of strict construction, applicable to adoption statutes in general, is especially required for "adoption consent procedures, which permit, and carefully safeguard, the process *633 of informed decision-making. The integrity of this process is an absolute necessity” (Dennis T. v Joseph C., 82 AD2d 125, 129 [2d Dept 1981]).
Domestic Relations Law § 112 (2) refers to "the consents required by section one hundred eleven of this article”, which would include the consent of the birth mother pursuant to Domestic Relations Law § 111 (1) (c). A strict construction of Domestic Relations Law § 112 (2) would require original consents (the consents). This argument was put best by the Law Guardian in his closing comments: " 'The consents required by Sec. Ill of this Article’ should mean the consents, not copies or testimonial evidence that such consents were signed, especially where the legislature has gone so far as to specify not only the content of the document, but the size of the print and manner of its execution.”
Domestic Relations Law § 115 (9) also supports the argument for original consents: "9. The petition must be verified, the agreement and consents executed and acknowledged the proof given and the affidavit sworn to by the respective persons before such judge or surrogate; but where the verification, agreement or consent of an adoptive parent, parent or person whose consent is necessary to the adoption is duly acknowledged or proved and certified in form sufficient to entitle a conveyance to he recorded in this state, (except that when executed and acknowledged within the state of New York, no certificate of the county clerk shall be required), such judge or surrogate may grant the order of adoption without the personal appearance of such adoptive parent, parent or person” (emphasis added).
The birth parents point to this provision, which requires the consent to be in form sufficient to entitle a conveyance to be recorded in this State, and argue that this requires filing of the original consent.
Taking judicial notice of this court’s past practice, construing the statutes and Family Court Rules in pari materia, and applying rules of strict construction thereto, the court concludes that the birth mother’s extrajudicial consent, in its original form, must be filed with the court. In his closing comments, the Law Guardian cogently stated the case for filing: "The requirement for filing provides a clear starting point for inquiry, avoids the necessity for time consuming fact finding hearings such as we’ve had here * * * and generally maintains the quality and integrity of the process.”
Extrajudicial consents are the exception rather than the rule, and their acceptance is discretionary with the court. As a *634 general rule, "all persons whose consent is required * * * must appear for examination before the judge * * * where the adoption proceedings are instituted.” (Domestic Relations Law § 115 [3].) At the appearance, the consents must be executed and acknowledged before the Judge. (Domestic Relations Law § 115 [9].)
It is discretionary with the Judge whether to dispense with the personal appearance of the parent or person whose consent is necessary to the adoption. (Id.) In the limited circumstances where such personal appearance is dispensed with, "the reason therefor must be for good cause shown, and shall be recited in the order of adoption”. (Id.) One Family Court, in dispensing with the appearance of a natural mother for examination before the court in an interstate adoption, noted the "flawless compliance” with the statute. (Matter of Baby Boy N., 150 Misc 2d 535, 540 [Fam Ct, NY County 1991].)
It has been noted that "the appearance of a natural parent before a Judge remains the preferred procedure” (Matter of Baby Boy N., supra, at 540), and further that "[S]ome judges will accept only judicial consents.” (Scheinkman, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115-b, 1995 Pocket Part, at 138-139.)
The adoptive parents also argue that since an original consent exists, and is being withheld, then CPLR 2101 (e) would permit the filing of a copy. CPLR 2101 (e) does provide for the use of copies when required originals are withheld, but the provision is permissive rather than mandatory ("the court may authorize a copy to be served or filed”). As noted, this court has never authorized the filing of a copy of a consent in lieu of the original, and declines to do so at this time.
Ms. Herman, a member of the American Academy of Adoption Attorneys, concedes that she is aware of no contested adoption approved without an original consent. Moreover, she is aware of no authority for requiring the involuntary filing of the existing original, which is being withheld by Jill’s attorney.
"We are concerned here not with technicalities, but with procedural requirements which were created by the Legislature in order to ensure that the most critical of human relationships, mother and child, would not be easily abrogated.” (State of New York ex rel. Dunn v Catholic Home Bur., 125 AD2d 106, 112 [1st Dept 1987].)
This case is similar to the situation presented to the Appellate Division in Matter of Samuel (167 AD2d 909 [4th Dept *635 1990]): "Family Court found, and we agree, that the natural mother changed her mind about placing her child for adoption, and that she communicated her change of mind to her attorney who, in turn, communicated it to the adoptive parents before the extrajudicial consent took effect and before physical custody of the child was transferred to the adoptive parents. The court found that the natural mother timely rescinded her attorney’s authority to file the extrajudicial consent and to place the child.” (Emphasis added.)
In the case at bar, Jill "rescinded her attorney’s authority to file the extrajudicial consent” when she called Elizabeth Lacy on April 14. While Jill did not explicitly direct Ms. Lacy to withhold the original consent, she conveyed her clear intention to revoke her consent to the adoption and in effect "rescinded her attorney’s authority to file the extrajudicial consent”. Despite protestations to the contrary by counsel for the adoptive parents, no other inference can be drawn from Jill’s unequivocal demand to Ms. Lacy for the return of Jarrett.
In Samuel (supra), the Appellate Division noted that the birth mother rescinded her attorney’s authority "to file the extrajudicial consent”, confirming this court’s interpretation that the original consent must be filed.
In Samuel (supra), the birth mother’s change of mind occurred before physical custody of the child had been transferred, and the subsequent transfer was "in flagrant disregard of the mother’s instructions.” (167 AD2d, at 910, supra.) In the instant case, the transfer of physical custody had taken place prior to April 14. Absent a valid consent, however, this fact alone should not change the result. The Fourth Department found that placement of the child was unauthorized under Social Services Law § 371 (12) once the birth mother communicated her change of mind.
The Court of Appeals affirmed the Fourth Department, noting that "it would be absurd to conclude that every consent that is privately signed and immediately withdrawn by a birth parent nonetheless triggers the formal revocation mechanism that puts a birth parent on equal footing with a potential adoptive parent”. (Matter of Samuel, 78 NY2d 1047, 1048 [1991].)
Had the Court of Appeals concluded its decision at that point, or merely affirmed the lower court without opinion, Samuel (supra) would seem to control our situation. However, the Court of Appeals continued: "Indeed, the several provisions of the Domestic Relations Law referring to the adoptive parents and to the court in which the adoption proceeding has been or is to *636 be commenced, plainly contemplate that there be some overt manifestation to a third person for an extrajudicial consent to be operative.” (78 NY2d, at 1048, supra [emphasis added].)
There was arguably "some overt manifestation to a third person” by Jill following the execution of the consent on April 10. As suggested by the Law Guardian, a copy of the consent was delivered to the attorney for the adoptive parents, presumably in furtherance of the adoption. In addition, Jill’s letter to Dennis and Karen confirmed her decision. There was no filing of her original consent, however, since she had "rescinded her attorney’s authority” to do so.
For reasons unknown, the Court of Appeals felt compelled to add: "We emphasize that * * * our analysis adds no requirement of delivery of the consent document, or any other requirement to the statute.” (Matter of Samuel, supra, at 1049.) In the instant case, there was no delivery of the original consent document, but the foregoing language indicates that an extrajudicial consent may be operative even without delivery of the document, provided that there has been "some overt manifestation to a third person.”
The paradox created by Samuel (supra) is Emersonian ("consistency is the hobgoblin of little minds”). If, as the Court of Appeals has held, "some overt manifestation” renders a consent operative, with no requirement of "delivery of the consent document,” how then can Samuel be reconciled with Domestic Relations Law § 115-b (5), which provides that a court is not compelled to hear an adoption petition until all necessary documents (including the birth mother’s consent) have been "filed to the satisfaction of the court”? A literal reading of Samuel could require a best interest hearing, as part of "the formal revocation mechanism”, where a consent has been neither delivered nor filed with the court. It would then render meaningless Domestic Relations Law § 115-b (5) by eliminating the Family Court’s discretion to hear (or refuse to hear) an adoption petition based upon the satisfactory (or unsatisfactory) filing of necessary documents.
An exámple will illustrate this contradiction. Under the holding in Samuel (supra), an extrajudicial consent, if valid, would become operative with an overt manifestation to a third person, even without delivery of the consent document. The adoptive parents could submit an adoption petition, which the court clerk would be required to accept, even without any supplementary documentation (Domestic Relations Law § 115-b [5]). The birth mother’s recourse then would be to give notice *637 of revocation to the court (Domestic Relations Law § 115-b [6] [a]). If her revocation were opposed by the adoptive parents (Domestic Relations Law § 115-b [6] [b] [ii]), then the court would conduct a best interest hearing (Domestic Relations Law § 115-b [6] [d]), at which the adoptive parents might prevail. However, absent the original consent document, which was never delivered and hence never filed, the court would be under no obligation to hear the underlying adoption petition (Domestic Relations Law § 115-b [5]).
The result would then be dismissal of the adoption petition, at the same time finding that the best interests of the child would be served by remaining with the adoptive parents. This exercise in futility is avoided in the case at bar by relying on Domestic Relations Law § 115-b (5) and refusing to hear the adoption petition for lack of an original extrajudicial consent, which has always been required by this court. The Court of Appeals in Samuel (supra) made no reference to Domestic Relations Law § 115-b (5), presumably leaving its provisions undisturbed. Accordingly, this court, in the exercise of its discretion and in keeping with its usual practice, will not hear the adoption petition.
DECISION
In summary, the lack of the birth mother’s original consent on file with this court justifies this court’s refusal to hear the adoption petition obviates the need for a best interest hearing and requires dismissal of this petition. Based upon the foregoing decision, there is no need to further address the pending motions to dismiss and for summary judgment.
The petition of the adoptive parents is dismissed. Custody of Jarrett is granted to Jill, subject to the further order of the Court of Common Pleas of Westmoreland County, Pennsylvania.