**WEIZMANN INSTITUTE OF SCIENCE, Plaintiff,**

v.

**Janet C. NESCHIS, individually and in her capacities as Trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997, and as Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, Robert R. Littman, individually and in his capacity as Successor Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, and Marilyn G. Diamond, in her capacity as Trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997, and as Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, Defendants.**

**Alice Ann Jung on her own behalf, as Executrix of the Estate of Miroslav Jung, Deceased, Josef Jung, Michelle Jung, and Jaroslav Jung a/k/a Jerry Jung, Plaintiffs,**

v.

**Janet C. Neschis, individually and in her capacities as Trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997, and as Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman**

dated April 23, 1993, Robert R. Littman, individually and in his capacity as Successor Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, and Marilyn G. Diamond, in her capacity as Trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997, and as Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, Defendants.

Nos. 00 CIV.7850(RMB),
01 CIV.6993(RMB).

United States District Court,
S.D. New York.

Oct. 3, 2002.

Janet Neschis, Marilyn Diamond, Paul
Curran Kaye, Scholer, Fierman, Hays &

Handler, LLP, New York City, for Plaintiff.

Leon P. Gold, Elise A. Yablonski, Proskauer Rose, Rose, LLP, New York City, for Defendants.

BERMAN, District Judge.

## I. Introduction

Plaintiff Weizmann Institute of Science ("Weizmann") commenced an action against defendants Janet C. Neschis ("Neschis"), Robert R. Littman ("Littman"), and Marilyn G. Diamond ("Diamond") (collectively, "Defendants") on or about October 16, 2000. Weizmann's complaint ("Weizmann Complaint") alleges six causes of action: (i) declaratory judgment that Weizmann is entitled to 37% of the assets of the Anturia Foundation, a nonparty; (ii) conversion; (iii) tortious interference with contractual relations; (iv) tortious interference with expectancy of inheritance; (v) violation of 18 U.S.C. § 1962(c); and (vi) violation of 18 U.S.C. § 1962(d).[1] Weizmann alleges that the Court has jurisdiction over its claims pursuant to 18 U.S.C. § 1965(a) (RICO), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332(a)(2) (diversity), and 28 U.S.C. § 1367 (supplemental jurisdiction). (Weizmann Complaint ("WC") ¶ 4).

Plaintiffs Alice Ann Jung, Josef Jung, Michelle Jung, and Jaroslav Jung, a/k/a Jerry Jung (collectively, "Jungs") commenced an action against Defendants on or about July 30, 2001.[2] The Jungs' complaint ("Jung Complaint") alleges nine causes of action: (i) declaratory judgment that the Jungs are entitled to 20% of the assets of the Anturia Foundation, a nonparty; (ii) conversion; (iii) tortious interference with contractual relations; (iv) tortious interference with expectancy of inheritance; (v) violation of 18 U.S.C. § 1962(c); (vi) violation of 18 U.S.C. § 1962(d); (vii) injunctive relief; and (viii) two counts seeking a constructive trust. The Jungs allege that the Court has jurisdiction over their claims pursuant to 18 U.S.C. § 1965(a) (RICO), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1367 (supplemental jurisdiction); they appear not to have plead diversity jurisdiction. (Jung Complaint ("JC") ¶ 13).

On September 26, 2001, the Court consolidated these two cases for pre-trial purposes, including motion practice. On or about October 19, 2001, Defendants moved jointly, pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6) and 12(b)(7), to dismiss Plaintiffs' claims for, *inter alia,* failure to state a claim upon which relief can be granted and failure to join a necessary party, *i.e.,* the Anturia Foundation. *See* Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss the Complaints, dated October 19, 2001 ("Def.Mem."). On November 15, 2001, Plaintiffs filed their Joint Brief in Opposition to Motion to Dismiss ("Pl. Opp." or "Opposition Brief"). Defendants filed a reply brief, dated November 20, 2001 ("Def.Reply"). On December 17,

---

1. Weizmann's fifth and sixth causes of action arise under the Racketeering Influenced and Corrupt Organization Act of 1970 ("RICO"). Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Sec-

tion 1962(d) makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

2. Weizmann and the Jungs are referred to collectively as "Plaintiffs." The Weizmann Complaint and the Jung Complaint are referred to collectively as "Complaints."

2001, Plaintiffs moved jointly for a preliminary injunction "pending the Court's decision on [D]efendants' currently pending motions to dismiss...." Notice of Motion for a Preliminary Injunction, dated December 17, 2001, at 2.

**For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part and Plaintiffs' motion for a preliminary injunction is denied.**[3]

## II. Background

The following allegations from the Weizmann Complaint and the Jung Complaint are taken as true for the purposes of this motion. Jacques and Natasha Gelman, a married couple with no children, amassed a great personal fortune as a result of Mr. Gelman's successful career as an entertainment agent and film producer. (WC ¶ 10; JC ¶¶ 29–30). In 1985, the Gelmans deposited a substantial portion of their assets into a Liechtenstein "stiftung" called the Anturia Foundation ("Anturia" or "Foundation").[4] (WC ¶ 11; JC ¶ 31). The Foundation's Board of Trustees ("Board") enacted various sets of by-laws over time, all of which provide for the distribution of the Foundation's assets upon the death of

the surviving Gelman spouse.[5] (WC ¶ 13; JC ¶ 34).

After Mr. Gelman's death on July 23, 1986, Mrs. Gelman instructed the Board to make two sets of changes to the Foundation's by-laws.[6] (WC ¶¶ 15, 20; JC ¶¶ 37–38). Pursuant to her instructions, the Board adopted by-laws, dated August 10, 1989 ("August 10, 1989 By–Laws") which provided that, in the event of Mrs. Gelman's death, the Foundation's assets would be divided as follows: (1) 20% to Weizmann; (2) 34% (collectively) to the Jungs; and (3) 46% (collectively) to other named charities and beneficiaries.[7] In 1991, pursuant to Mrs. Gelman's instructions, the Board adopted by-laws dated August 13, 1991 ("August 13, 1991 By–Laws"). The August 13, 1991 By–Laws provided for the following distribution of the Foundation's assets upon Mrs. Gelman's death: (1) 20% to Weizmann; (2) 37% (collectively) to the Jungs; (3) 1% to Littman; and (4) 42% (collectively) to other named charities and beneficiaries. (WC ¶ 18; JC ¶ 41).

Plaintiffs allege that Mrs. Gelman developed Alzheimer's disease in late 1991 and that either the August 10, 1989 By–Laws or the August 13, 1991 By–Laws (or both

---

3. The Court is not here passing upon the ultimate merit of Plaintiffs' claims.

4. "A stiftung is a creation of the laws of Liechtenstein ..., resembling a trust, but not limited to specific lives in being. A stiftung can own property and is controlled by an administrator (known as a stiftungerat) whose powers and duties are comparable to a trustee." *Kraus v. Comm'r*, 59 T.C. 681, 685, 1973 WL 2582 (U.S.Tax Court, Feb. 22, 1973). By June 1998, the Foundation held more than $36 million. (WC ¶ 11; JC ¶ 32).

5. The Gelmans and the Board allegedly had a mutual (unwritten) understanding that the by-laws would be amended to change beneficiaries and alter bequests only upon the Gelmans' instructions. (WC ¶ 14; JC ¶ 35).

6. Each time Mrs. Gelman instructed the Board to make a change to the by-laws, she allegedly traveled to Zurich and noted the proposed changes, in her own handwriting, on a copy of the (then) current by-laws. (WC ¶ 15; JC ¶ 38).

7. Weizmann, a charitable organization located in Rehovet, Israel, is community of 2,400 scientists and graduate students which performs research and development activities in the areas of disease and hunger, environmental protection, and economic growth. (WC ¶ 6). The Jungs are Mrs. Gelman's blood relatives. (WC ¶ 18).

documents together) "were the last by-laws executed in accordance with Mrs. Gelman's instructions while Mrs. Gelman remained of sound mind and free of duress and undue influence." (WC ¶ 19–20; JC ¶ 43–44).[8]

Mrs. Gelman possessed other assets which were not part of the Foundation and which were to be disposed of by will to be probated in New York ("New York assets"). (WC ¶ 17; JC ¶ 40). Until 1989, Sidney Cohn, Esq. ("Cohn") prepared the Gelmans' wills and codicils. (WC ¶ 22; JC ¶ 49). Thereafter, Mrs. Gelman was represented by Diamond until Diamond became a Justice of the New York State Supreme Court, New York County, in 1991. (WC ¶¶ 9, 22; JC ¶¶ 26, 50). Neschis, Cohn's daughter and Diamond's former partner, became Mrs. Gelman's attorney in 1991. *Id.* Plaintiffs allege that beginning in late 1991, after Neschis became Mrs. Gelman's legal representative and continuing until Mrs. Gelman's death on May 2, 1998, Neschis and Littman took (unfair) advantage of Mrs. Gelman's mental condition by, among other things, "cementing themselves as the sole custodians of her substantial estate and charitable trust, unlawfully taking millions of dollars from Anturia Foundation and Mrs. Gelman's personal assets, and increasing the bequests, commissions and/or fees to be received by these defendants." (WC ¶ 23; JC ¶ 51).

Plaintiffs allege that Neschis and Littman "fraudulently assum[ed] fiscal authority over Mrs. Gelman's assets," by, among other things, securing the following documents after Mrs. Gelman no longer possessed mental or testamentary capacity: (1) general powers of attorney in favor of Neschis and Littman and (several) powers of attorney which gave Neschis the authority to conduct transactions at Mrs. Gelman's New York banks; (2) a last will and testament, executed on April 23, 1993 ("1993 Will"), appointing Neschis as executor and appointing Diamond and Littman as alternate executors; and (3) an affidavit by Mrs. Gelman, signed on October 28, 1994, stating that, at the time of the 1993 Will, she intended that Neschis receive a commission for her services as executor and that Neschis' law firm receive legal fees for administering her estate.[9] (WC ¶¶ 23–29; JC ¶¶ 51–53, 75–88).

8. In March 1995, Dr. Fred Plum, a neurologist, stated in a written report that "Mrs. Gelman appears to have progressive Alzheimer's Disease with a fairly typical pattern of memory loss leading all other cognitive disabilities in their deterioration," and that "the results of the present examination indicate that she lacks testamentary mental capacity." (WC ¶ 21; JC ¶ 47). Plaintiffs allege that Mrs. Gelman began to experience symptoms of Alzheimer's "[s]ome time in late 1991." (WC ¶ 20; JC ¶ 44).

9. Under the 1993 Will, Miroslav Jung, Jaroslav Jung and Mario Sebastian—Mrs. Gelman's closest living relatives—each received a bequest of $10,000, while Littman received a bequest of $500,000. (WC ¶ 26; JC ¶¶ 77–78). Plaintiffs allege that "[t]he bequests to the Jung Family are significantly lower, and the bequest to Littman is significantly higher, than bequests in earlier wills executed by Mrs. Gelman." (WC ¶ 26; *see also* JC ¶ 79). The 1993 Will also established the Jacques and Natasha Gelman Trust ("Testamentary Trust") for charitable, literary and educational purposes, which was to be funded from Mrs. Gelman's residuary estate, *i.e.*, that portion of her estate which was not specifically devised or bequeathed. (WC ¶ 27; JC ¶ 80). Neschis and Diamond were appointed as co-trustees of the Testamentary Trust, and Littman was appointed as alternate trustee. (WC ¶ 27; JC ¶ 81). The trustees are authorized to spend the income and principal of the Testamentary Trust in their sole discretion. *Id.* Plaintiffs allege that "[t]he reduction of the bequests to the Jung family substantially increased Mrs. Gelman's residuary estate, which was to be placed into the Testamentary Trust, to the substantial personal benefit of defendant Neschis." (WC ¶ 27; *see also* JC ¶ 82).

Plaintiffs further allege that Neschis "fraudulently obtained" an amendment to the Foundation's by-laws which eliminated Weizmann as a beneficiary and drastically reduced the amount of the bequests to the Jungs. (WC ¶ 33; JC ¶ 60). "In or about April 1992, Neschis traveled to Zurich with Mrs. Gelman to meet with representatives of Credit Suisse and/or Fides, the asset management company responsible for administering the ... Foundation." (WC ¶ 30; JC ¶ 54). During this trip, Dr. Madeline–Claire Levis ("Levis"), a Fides employee, came to believe that Mrs. Gelman was not of sound mind. (WC ¶ 30; JC ¶ 55). Plaintiffs allege that Neschis fraudulently obtained Mrs. Gelman's signature on a letter dated June 5, 1992 to the Board ("June 5, 1992 Letter"), instructing that certain changes be made to the by-laws, and transmitted the letter to Levis.[10] (WC ¶ 33; JC ¶¶ 60–62). Although Levis initially "refused to make the requested changes without a satisfactory explanation of the unusual circumstances," she was allegedly compelled to do so after Neschis threatened to withdraw the Foundation's assets from Credit Suisse Bank and persuaded one of the Board members to intervene. (WC ¶¶ 34–35; JC ¶¶ 64–66).

In or about October 1992, Neschis presented a letter to the Board from Mrs. Gelman and dated September 29, 1992 ("September 29, 1992 Letter") purporting to contain Mrs. Gelman's instructions for amending the Foundation's by-laws. (WC ¶ 37; JC ¶ 68). In accordance with the September 29, 1992 Letter, the Board adopted new by-laws on or about October 19, 1992 ("October 19, 1992 By–Laws") which, *inter alia*, eliminated Weizmann as

a beneficiary, reduced the Jungs' allocation to 5% of the Foundation's assets, increased Littman's share from 1% to 31% of the assets, added Diamond as a beneficiary of 3% of the assets, and added the Testamentary Trust as a beneficiary of 57% of the assets.[11] (WC ¶¶ 37–38; JC ¶¶ 69–70).

Plaintiffs further allege that "[i]n April 1992 and continuing through 1998, Neschis caused substantial distributions to be made from the assets of the ... Foundation to herself or for her personal benefit." (WC ¶ 41; JC ¶ 89). Neschis presented a handwritten note, dated April 30, 1992 and purportedly signed by Mrs. Gelman, directing Credit Suisse to " 'arrange for the immediate transfer to my Credit Suisse, New York account of $150,000 (U.S.)' from the accounts of the ... Foundation and/or from accounts held for the Gelmans." (WC ¶ 42; JC ¶ 91). In addition, the April 1992 note instructed the bank to send all future interest payments directly to the same New York account. (WC ¶ 42; JC ¶ 92). Credit Suisse complied with these instructions and transferred approximately $ 2.5 million from the Credit Suisse Zurich account to the Credit Suisse New York account between November 30, 1992 and February 28, 1995. (WC ¶ 43; JC ¶ 94). Plaintiffs also allege that Credit Suisse Zurich periodically sent other distributions to the Credit Suisse New York account "in excess of $ 10 million." (WC ¶ 43; JC ¶ 95).

Plaintiffs allege that on or about November 18, 1997, Neschis fraudulently induced Mrs. Gelman to execute an instrument creating a second trust, also named the Jacques and Natasha Gelman Trust ("In-

---

**10.** In or about June 1992, Neschis had asked Levis to explain the procedure for changing the Foundation's by-laws and specifically inquired whether a letter from Mrs. Gelman would suffice. (WC ¶ 31; JC ¶ 56).

**11.** It is not clear from the Complaints how the Testamentary Trust, which was not apparently created until April 23, 1993 (WC ¶ 27; JC ¶ 80), came to be named as a beneficiary of the Foundation on October 19, 1992.

ter Vivos Trust"), which designated Neschis and Diamond as its co-trustees.[12] (WC ¶ 46; JC ¶¶ 98–99). The Inter Vivos Trust instrument provides that: (i) "[i]n addition to commissions, the [t]rustees are authorized to perform professional services for the Inter Vivos Trust at their regular rates;" (ii) "[t]he [t]rustees are also expressly authorized to arbitrate and settle claims on behalf of the Inter Vivos Trust;" and (iii) "[t]he trustees are expressly excused from filing inventories and periodic accountings in any court."[13] (WC ¶ 46; JC ¶ 99). That same day, Mrs. Gelman allegedly signed a letter to the Foundation requesting, *inter alia,* that the Inter Vivos Trust be substituted for the Testamentary Trust as the beneficiary of 58% of the Foundation's assets. (WC ¶ 49; JC ¶¶ 106–07). The Foundation's by-laws were amended again on January 27, 1998 ("January 27, 1998 By–Laws") to reflect this change in beneficiaries. (WC ¶ 49; JC ¶ 107).

Mrs. Gelman died on May 2, 1998. (WC ¶ 53; JC ¶ 110). On or about September 21, 1999, the Court of Arbitration in Liechtenstein began arbitration proceedings ("Liechtenstein Arbitration") between Neschis and Diamond, as trustees for the Jacques and Natasha Gelman Trust, and the Foundation.[14] *See* Decision of the Court of Arbitration ("Arbitration Order"), dated September 21, 1999, at 1. The Arbitration Order, among other things, lists the names of the arbitrators ("Arbitration Panel"), states that "the Court of Arbitration is duly formed pursuant to Article 13 of the bylaws of the Anturia Foundation, dated May 29, 1985," and outlines the procedures governing the Liechtenstein Arbitration. *See id.* at 1–4. On or about January 12, 2000, the Foundation filed its arbitration Answer to the Complaint/Interlocutory Motion for a Determination ("Answer"). On or about March 20, 2000, Weizmann filed its arbitration Joinder as Intervener/Answer to the Complaint/Preliminary Pleading ("Joinder"). The Joinder states, in pertinent part: "we have a legal interest in seeing the [Foundation] prevail, and we therefore join [the Foundation] as an intervening third party." Joinder at 1. On or about June 8, 2001, the Arbitration Panel issued its Award in Arbitration ("Arbitration Award"), finding, among other things, "that the 1992 and 1998 [foundation] by-laws are legally valid." Arbitration Award at 51. Pursuant to the January 27, 1998 By–Laws, 57% of the Foundation's assets will be distributed to the Inter Vivos Trust. (WC ¶ 49; JC ¶ 107).

**12.** Plaintiffs challenge the validity of the Inter Vivos Trust instrument because, among other things, (i) Mrs. Gelman's signature was not verified by a notary public—rather the notary attested only that "Neschis stated to him that Neschis saw Mrs. Gelman execute the instrument"—and (ii) "Mrs. Gelman's execution of the instrument was purportedly witnessed by Neschis and a witness whose signature is utterly illegible" and unverified. (WC ¶ 47; JC ¶¶ 100–103).

**13.** The trust instrument gives Neschis and Diamond "absolute discretion" to spend the Inter Vivos Trust assets "for use exclusively within the United States for religious, charitable, scientific, literary or educational purposes or for the prevention of cruelty to children or animals." (*Id.*).

**14.** Neither the Weizmann Complaint nor the Jung Complaint mentions the Liechtenstein Arbitration. The factual allegations in this paragraph are taken from the documents filed in the Liechtenstein Arbitration and supplied by Defendants in support of their motion to dismiss. As discussed *infra* at Section IV.A., the Court takes judicial notice of these documents "not for the truth of the matters asserted [therein], but solely to establish the fact of such litigation and related filings." *Kramer v. Time Warner,* 937 F.2d 767, 774 (2d Cir. 1991).

After Mrs. Gelman's death, Neschis offered the 1993 Will for probate in the Surrogate's Court, New York County ("Surrogate's Proceeding"). (WC ¶ 54; JC ¶ 111). On May 4, 1999, Alice Jung and Jaroslav Jung filed their Amended Objections to Probate and Jury Demand ("Am. Obj.") stating, among other things that the 1993 Will "was not freely or voluntarily made by [Mrs.] Gelman ... but that the said paper writing purporting to be her Last Will and Testament ... was procured by duress and undue influence ... Janet Neschis and Robert Littman ...." [15] Am. Obj. ¶ 4. **By stipulation dated as recently as April 26, 2001 ("4/26/01 Stip."), the Jungs agreed to withdraw their objections to probate of the 1993 Will if the Liechtenstein Arbitration "determine[d], for any reason, that the 1992 By–Laws are valid."** 4/26/01 Stip. at 1. On June 19, 2001—after the decision was rendered in the Liechtenstein Arbitration—Alice Jung and Jaroslav Jung (each) withdrew their objections to probate. *See* Withdrawal of All Objections of Alice Jung, ("Alice Jung...hereby withdraws her Objections to Probate..."); Withdrawal of All Objections of Jaroslav Jung, ("Jaroslav Jung hereby withdraws his Objections to Probate..."). On October 16, 2001, the Surrogate admitted the 1993 Will to probate. *See* Decree Granting Probate ("Probate Decree"). The Probate Decree states, in pertinent part, that (1) "the [1993] Will was duly executed;" (2) "the Testatrix, at the time of executing it, was in all respects competent to make a Will, and not under restraint;" and (3) "the Court [is] satisfied of the genuineness of the [1993] Will and the validity of its execution." Probate Decree at 2.

## III. Standard of Review

In resolving a Fed. R. Civ.P. 12(b)(6) motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This standard applies equally to RICO claims. *See NOW v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

At the same time, while "the well-pleaded material allegations of the complaint are taken as admitted ... conclusions of law or unwarranted deductions of fact are not admitted." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (citation omitted). Where, as here, a complaint alleges fraud, the pleading requirements of Fed.R.Civ.P. 9(b) apply. *Id.* Because the mere assertion of a civil RICO claim "has an almost inevitable stigmatizing effect on those named as defendants ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990).[16]

---

15. The factual allegations in this paragraph are taken from the documents filed in the Surrogate's Proceeding and supplied by Defendants in support of their motion to dismiss. As discussed fully *infra* at Section IV.A., the Court takes judicial notice of these documents. *See Kramer,* 937 F.2d at 774.

16. " 'Civil RICO is an unusually potent weapon— the litigation equivalent of a thermonuclear device.' " *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998) (citation omitted).

## IV. Analysis

### A. Materials and Matters Outside the Pleadings

█ In resolving a motion to dismiss, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).[17]

█ "Despite the submission of extra-pleading documents, [the Court does] not convert this motion into a motion for summary judgment under Rule 56(c)."[18]

*Scherer v. Equitable Life Assurance Soc'y*, 190 F.Supp.2d 629, 636 n. 2 (S.D.N.Y. 2002). Both Plaintiffs and Defendants have submitted extra-pleading documents in connection with the instant motion, only some of which, as herein noted, have been considered by the Court.

█ "A court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading."[19] *Preston v. State of New York*, 223 F.Supp.2d 452, 461–62 (S.D.N.Y.2002). "[C]ourts routinely take judicial notice of documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related fil-

---

17. Federal Rule of Evidence ("Fed.R.Evid.") 201, entitled "Judicial Notice of Adjudicative Facts," permits the Court to take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

18. In a telephone conference held on August 1, 2002, the Court requested that the parties provide additional briefing on whether the instant motion to dismiss should be converted to a motion for summary judgment with respect to the collateral estoppel issue. On August 5, 2002, the parties provided their joint response ("Ltr. Br."), opposing summary judgment: "[D]efendants submit that [the] record does not require conversion to summary judgment to enable the Court to consider the submissions by [D]efendants on the motion[] to dismiss." Ltr. Br. at 1. "Plaintiffs[] ... do not consent to the resolution of the collateral estoppel issue ... by summary judgment." Ltr. Br. at 2. "While a court may transform a 12(b)(6) motion into a summary judgment motion pursuant to Rule 56(c) if the parties submit evidence beyond the pleadings, such action is inappropriate unless the parties are given notice and an

opportunity to respond appropriately." *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments*, 154 F.Supp.2d 682, 688 (S.D.N.Y.2001).

19. The Court has considered the following documents, incorporated by reference in the Complaints, in deciding the motion to dismiss: (1) the Charter of the Anturia Foundation; (2) the Articles of Incorporation of the Anturia Foundation; (3) the June 7, 1985 by-laws of Anturia Foundation; (4) the October 1, 1985 by-laws of Anturia Foundation; (5) the October 27, 1986 by-laws of Anturia Foundation; (6) the August 10, 1989 by-laws of Anturia Foundation; (7) the August 13, 1991 by-laws of Anturia Foundation; (8) the October 19, 1992 by-laws of Anturia Foundation; (9) the January 27, 1998 by-laws of Anturia Foundation; (10) Mrs. Gelman's April 26, 1989 will; and (11) Mrs. Gelman's October 7, 1989 will. Document 1 herein is attached as an exhibit to the Declaration of Dr. Iur. Peter Monauni, dated November 9, 2001 ("Monauni Dec."), submitted by Plaintiffs. Documents 2–9 are attached as exhibits to the Affirmation of Johannes Michael Burger, dated October 19, 2001 ("Burger Aff."), submitted by Defendants. Documents 10–11 are attached as exhibits to the Affidavit of Seth Rubenstein, sworn to October 18, 2001 ("Rubenstein Aff."), submitted by Defendants.

ings." [20] *Kramer*, 937 F.2d at 774. "However, [some of] the evidence [the parties have] offered goes beyond these limited parameters and will not be considered." [21] *Jordan (Bermuda) Investment Co., Ltd.*, 154 F.Supp.2d at 689.

## B. Collateral Estoppel

■ Collateral estoppel bars a party from relitigating "an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point." *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir.1991); *see also Conte v. Justice*, 996 F.2d 1398, 1400 (2d Cir.1993) (citations and internal quotation marks omitted). Collateral estoppel, also referred to as "issue preclusion," applies "when an issue was necessarily and conclusively determined in a prior proceeding and the party to be bound had a full and fair opportunity to litigate the issue." *Sassower v. Abrams*, 833 F.Supp. 253, 264–65 (S.D.N.Y.1993). It is well-settled that "collateral estoppel can be raised and considered via a pretrial motion to dismiss." *HBP Assocs. v. Marsh*, 893 F.Supp. 271, 276 (S.D.N.Y. 1995); *see also Sassower*, 833 F.Supp. at 264 n. 18.

### 1. Liechtenstein Arbitration

■ Defendants argue that "collateral estoppel precludes Plaintiffs from re-litigating the factual predicate for their claims here when [the Liechtenstein Arbitration] conclusively determined the same issues adversely to Plaintiffs." Def. Mem. at 5. In response, Plaintiffs argue that "the Convention [on Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (1970) ("Convention") ] governs this dispute and, because Liechtenstein is not a signatory, bars all recognition of the Liechtenstein arbitration decision." Pl. Opp. at 8.

Ratified by the United States in 1970, *see* 9 U.S.C. § 201, the Convention governs "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." 21 U.S.T. at 2519. In ratifying the Convention, the United States reserved the right to "apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." 21 U.S.T. at 2566; *see* notes following 9 U.S.C. § 201. Plaintiffs argue that this reciprocity reservation "bars all

---

**20.** The Court takes judicial notice of the following documents pertaining to the New York Surrogate's Proceeding: (1) the May 4, 1999 amended objections to probate and jury demand; (2) the January 19, 2001 order of the Surrogate framing the issues; (3) a transcript of the March 28, 2000 hearing before the Surrogate; (4) the April 11, 2000 order of the Surrogate; (5) the April 26, 2001 letter from Henry Gradstein regarding agreement to withdraw objections; (6) June 19, 2001 withdrawal of all objections to probate by Alice Jung; (7) June 19, 2001 withdrawal of all objections to probate by Jaroslav Jung; and (8) the October 16, 2001 decree granting probate. These documents are attached as exhibits to the Rubenstein Aff.

**21.** Plaintiffs have also submitted the Declaration of Jerry Jung, sworn to November 8, 2001 ("Jung Dec."), to "provide a brief background of the issues set forth in the [C]omplaints ... and to rebut some of the 'facts' provided by the Defendants." Jung Dec. ¶¶ 2–3. And, portions of the Burger Affirmation, the Burger Reply Affirmation, and the Rubenstein Affirmation attempt to introduce evidence and legal arguments presented to the Arbitration Panel and the Surrogate's Court in these prior proceedings. The Court has not considered these materials, which "attempt to introduce evidence or legal arguments presented to the ... court[s] in the prior related action[s]" in deciding the motion to dismiss. *See id.* at 690.

recognition of the Liechtenstein arbitration decision." Pl. Opp. at 8.

The reciprocity provision of the Convention signifies that the United States will recognize and enforce pursuant to the Convention "only arbitral awards made in nations that also adhere to the Convention." Pl. Opp. at 6 (quoting *Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 482 (7th Cir.1997)). Defendants do not appear to be asking this Court to recognize and enforce the Liechtenstein Arbitration award pursuant to the Convention. Defendants seem to be asking this Court to treat the arbitral award as a foreign judgment, outside the scope of the Convention. *See e.g.*, Def. Reply at 2 (Reciprocity provision, "does not mean...that foreign arbitration awards not falling under the Convention are unenforceable.") *See also.*, Restatement (Third) of Foreign Relations Law § 487 cmt. h (1987) ("Foreign arbitral awards not falling under the Convention are generally enforceable in the United States in the same manner as foreign judgments...whether or not they have been judicially confirmed in the state where made.")

Plaintiffs also claim that this Court should not give preclusive effect to the Liechtenstein Arbitration because they "were deprived of a full and fair opportunity to participate in the arbitration." Pl. Opp. at 8.[22] Defendants argue that Plaintiffs, "have failed to produce any evidence of any actual prejudice, and none of their assertions establishes a denial of full and fair participation." Def. Reply at 3. At this stage of the litigation (i.e. absent further discovery) it is inappropriate for the Court to make a determination of whether or not Plaintiffs had a full and fair opportunity to participate in the Liechtenstein

Arbitration. *See e.g., Schenk v. Mine Management Co.*, 89 Civ. 97, 1997 WL 31400, *2 (N.D.N.Y. Jan. 23, 1997) ("Thus, even though the court could properly consider res judicata and collateral estoppel defenses on a pretrial motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)...it will not do so here.")

### 2. New York Surrogate's Court Proceeding

Defendants argue that the Jungs "are further barred by the collateral estoppel effects of a probate proceeding in the New York County Surrogate's Court...." Def. Mem. at 5. Plaintiffs reply that the sole issue in the Surrogate's Proceeding was the validity of the 1993 Will and the Jung Complaint "challenge[s] a series of events and transactions that occurred at times other than April 23, 1993, including creation of the [I]nter [V]ivos [T]rust in November 1997 and the September [29,] 1992 letter directing changes to the [Foundation's] by-laws." Pl. Opp. at 13.

■■■ Although the Jungs initially objected to probate of the 1993 Will, they eventually withdrew those objections and the 1993 Will was admitted to probate on October 16, 2001. *See* Withdrawal of All Objections (Alice Jung) ("Pursuant to the Stipulation of the parties dated April 26, 2001, Alice Jung, Executrix of Miroslav Jung, hereby withdraws her Objections to Probate verified April 16, 1999, and Amended Objections to Probate verified May 4, 1999."); Withdrawal of All Objections (Jaroslav Jung) ("Pursuant to the Stipulation of the parties dated April 26, 2001, Jaroslav Jung hereby withdraws his Objections to Probate verified April 16, 1999, and Amended Objections to Probate

---

**22.** In a somewhat surprising call to chambers on September 30, 2002, counsel for the Jungs sought to supplement their brief on this point.

verified May 4, 1999."); Probate Decree at 3 ("[T]he instrument offered for probate . . . is admitted to probate as the Last Will and Testament of Natasha Gelman . . . ."). New York law requires that "[b]efore admitting a will to probate the court must inquire* particularly into all the facts and must be satisfied with the genuineness of the will and the validity of its execution." N.Y. Surr. Ct. Proc. Act § 1408 (McKinney 1995); *see also In re Will of Mussman*, 29 Misc.2d 462, 463, 218 N.Y.S.2d 236, 237–38 (1961) (holding that the Surrogate has a duty "to inquire into all the facts and circumstances with respect to the genuineness and validity of a will before admitting it to probate"). Thus, the admission of the 1993 Will to probate precludes the Jungs from re-litigating the validity of the 1993 Will, including Mrs. Gelman's testamentary capacity to execute the will. *See In re Rogers' Estate*, 168 Misc.2d 633, 641, 6 N.Y.S.2d 255, 262 (1938) (holding that party was collaterally estopped from challenging the will's execution and the testator's capacity where no objections were raised to probate of the will); *see also Wolcott v. Hutchins*, 245 F.Supp. 578, 581 n. 1 (S.D.N.Y.1965) (holding that plaintiff was collaterally estopped from asserting a claim for conspiracy to exercise undue influence "because the question of undue influence could only be raised at the time of the probate of the will and plaintiff concedes that by [signing a release] he gave up his right, if any, to object to the probate.").

At the same time, collateral estoppel does not preclude the Jungs from raising issues and challenging those documents, if any, that were not part of the probate proceeding. *See e.g. In re Will of Joseph P. Reardon*, 36 Misc.2d 307, 308, 232 N.Y.S.2d 581, 582 (1962).

## C. Applicable Law

The parties disagree whether Liechtenstein or New York law governs Plaintiffs' tort claims. Defendants argue that the Court should apply Liechtenstein law, *see* Def. Mem. at 6, while Plaintiffs contend that New York law applies. *See* Pl. Opp. at 14–15.

 "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989). Accordingly, New York's choice of law rules govern Plaintiffs' (non-RICO) claims which are premised on diversity and supplemental jurisdiction. "In tort cases . . . New York applies the law of the state with the most significant interest in the litigation." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999) (citation omitted). The purpose of this "interest analysis" is "to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521, 644 N.E.2d 1001, 1002, 620 N.Y.S.2d 310, 311 (1994). Where, as here, the parties are domiciled in different states, and the issue is the standard governing Defendants' conduct, the place or location of the tort is determinative.[23] *See Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir.1996) ("Where the parties are domiciled in different states, the locus of the tort will almost always be determinative . . ."); *Bing v. Halstead*, 495 F.Supp. 517, 520 (S.D.N.Y.1980) ("Where the issue is the standard of conduct . . . rather than the extent of liability, it is appropriate to look to the place of the tort so as to give

---

**23.** Weizmann is domiciled in Israel (WC ¶ 4), the Jungs are domiciled in California (JC ¶¶ 15–17), and the Defendants are domiciled in New York (WC ¶¶ 7–9; JC ¶¶ 19, 22, 26).

effect to that jurisdiction's interest in regulating conduct within its borders. . . .").

■ Based on the Complaints, it appears that the acts giving rise to the alleged conversion and tortious interference by Defendants occurred, in large part, in New York. For example, Plaintiffs allege that Neschis and Littman obtained control over Mrs. Gelman's New York bank accounts and directed the transfer of (some of) the Foundation's assets to her Credit Suisse New York account, (WC ¶¶ 24, 42–44; JC ¶¶ 52, 91–96), and that Defendants' alleged scheme to gain control over Mrs. Gelman's assets was formed and (largely) effected in New York by Defendants, (WC ¶¶ 1, 5; JC ¶¶ 5, 14). *See e.g., Solow v. Stone,* 994 F.Supp. 173, 177 (S.D.N.Y.1998) (applying New York law where "the acts giving rise to the . . . tortious interference claims took place, in significant part, in New York").

This does not mean, however, that this Court may not apply Liechtenstein law in determining some of the issues arising out of the Plaintiffs' claims. "There is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction." *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 845 (2d Cir.1989) quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 285, 240 N.Y.S.2d 743, 752 (1963). For example, because Plaintiffs have alleged that a contract formed by the by-laws of a Liechtenstein foundation is the basis for their conversion and tortious interference with contract claims, it may be appropriate for the Court to look to Liechtenstein law to determine whether a contract existed. *See, e.g., Lund's,* 870 F.2d at 845 (separately applying Minnesota and New York law to determine issues underlying a conversion claim.) *See also Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 772 n. 30 (S.D.N.Y.1990) (noting that

a tortious interference with contract claim "appears to be the sort of 'mixed' claim that might call for exercise of depecage, *i.e.* application of separate law to distinct issues.")

■ Under New York's choice of law rules, in deciding contract issues the Court will apply a "center of gravity" or "grouping of contacts" approach. *See Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir.1996). "Under this approach, courts may consider a spectrum of significant contacts, including the place of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Id.* at 1030–31. New York's choice of law rules may require the Court to look to Liechtenstein law to determine whether the Foundation by-laws created an enforceable contract. *See e.g., Red Rock Holdings, Ltd. v. Union Bank Trust Co., Ltd.,* 97 Civ. 5008(JGK), 1998 WL 474094 at *10 (S.D.N.Y. Aug. 11, 1998) (Finding that the "center of gravity" favored Israeli law.)

### D. Declaratory Judgment

■ Defendants move to dismiss Plaintiffs' claim for declaratory judgment, *inter alia,* on the grounds that Plaintiffs have failed to join Anturia, an allegedly indispensable party, as a defendant. Plaintiffs "seek a declaratory judgment that they are Anturia's proper distributees," making the Foundation an necessary party pursuant to Rule 19, "because complete relief cannot be granted without it." Def. Mem. at 9. Defendants also argue that joinder of Anturia is not feasible because the Foundation "is a Liechtenstein entity without any American contacts, and its Board is comprised of Liechtenstein and Swiss citizens." *Id.* at 10. Plaintiffs counter that Anturia is not an indispensable party they are not seeking relief against the Founda-

tion. "Because plaintiffs seek no relief against Anturia, and seek relief with respect to Anturia's assets only after such funds come into defendants possession in New York, neither the Anturia Foundation nor its trustees are indispensable parties." Pl. Opp. at 16.

"Fed.R.Civ.P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit *i.e.*, whether the party qualifies as a 'necessary' party under Rule 19(a)." *Viacom Int'l v. Kearney,* 212 F.3d 721, 724 (2d Cir.) *cert. denied,* 531 U.S. 1051, 121 S.Ct. 655, 148 L.Ed.2d 558 (2000).[24] Once a court has made a threshold determination that a party is necessary and that "joinder of the absent party is not feasible for jurisdictional or other reasons, *see* Fed.R.Civ.P. 19(b) (stating that, if an absent party satisfies the Rule 19(a) standard, a court must next assess the feasibility of joinder before conducting a Rule 19(b) analysis)..., the court must finally determine whether the party is 'indispensable.'" *Viacom,* 212 F.3d at 725. In assessing whether a party is "indispensable," the Court must "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed..." Fed.R.Civ.P. 19(b).

Based on the relief requested by Plaintiffs in the Complaints, Anturia is a necessary party. That is, the Complaints ex-plicitly request relief directly implicating Anturia. Count I of both Complaints, for example, alleges that Plaintiffs are "entitled to receive a distribution of [57%] of the assets, wherever located, of the Anturia foundation." (WC ¶ 58, JC ¶ 115). In addition, Plaintiffs prayer for relief asks for "a declaration that the [Plaintiffs] are entitled to receive a distribution of [57%] of the assets, wherever located of the Anturia Foundation," (WC at 32, JC at 36).[25] Because Plaintiffs themselves allege that complete relief cannot be granted without involving Anturia, the Foundation is a "necessary" party. *See e.g. Associated Dry Goods Corp. v. Towers Financial Corp.,* 920 F.2d 1121, 1124 (2d Cir.1990).

The Court is not convinced at this point that Anturia's "joinder...is not feasible for jurisdictional or other reasons." *Viacom,* 212 F.3d at 725. If Plaintiffs wish to pursue declaratory relief claims as presently plead, joinder of Anturia is warranted. If joinder is not feasible, then Plaintiffs must show why the declaratory judgment claims should not be dismissed. *See* Fed.R.Civ.P. 19(b), *see also Ediciones Quiroga, S.L. v. Fall River Music, Inc.,* 93 Civ. 3914(RPP), 1995 WL 103842 at *11 (S.D.N.Y. Mar. 7, 1995).

## E. Statute of Limitations/Estoppel

Defendants also argue, *inter alia,* that Plaintiffs' conversion and tortious interference with contract claims are barred by the statute of limitations. Def. Mem. at 13–14, 17–18. Plaintiffs contend that

---

**24.** Rule 19(a) defines a party as "necessary" when: "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or oth-erwise inconsistent obligations by reason of the claimed interest." Fed.R.Civ.P. 19(a).

**25.** In their motion papers, however, Plaintiffs argue that they seek "judgements against Neschis and Littman," and "a declaration concerning plaintiffs' right to receive funds held by defendants in New York..." (Pl. Opp. at 16).

**252**

"[D]efendants' concealment of their wrongdoing entitles [P]laintiffs to an equitable tolling of the statute of limitations." Pl. Opp. at 17.

"While a statute of limitations defense may be raised in a motion to dismiss ... such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir.1989) (quoting *Abdul-Alim Amin v. Universal Life Ins. Co.*, 706 F.2d 638, 640 (5th Cir.1983)) (internal quotations omitted). Because these claims arise under New York law, the New York statutes of limitations apply. And, "[a]s the doctrines of equitable tolling would affect the relevant statute of limitations, state law of equitable tolling should govern the state claims ...." *Meridien Int'l Bank Ltd. v. Government of Liberia*, 23 F.Supp.2d 439, 446 (S.D.N.Y.1998).

Under New York law, a three-year statute of limitations applies to conversion claims. *See* N.Y. C.P.L.R. § 214(3) (McKinney 1990); *see also Songbyrd, Inc. v. Estate of Grossman*, 23 F.Supp.2d 219, 222 (S.D.N.Y.1998). The limitations period on a conversion claim begins to run from the time of conversion, *Songbyrd*, 23 F.Supp.2d at 222, which Plaintiffs allege occurred when Defendants "caus[ed] the execution of the October 19, 1992 By-Laws." (WC ¶ 62; JC ¶ 121). The statute of limitations for a tortious interference with contract claim is also three years. *See* N.Y. C.P.L.R. § 214(4) (McKinney 1990); *see also Cary Oil Co. v. MG Refining & Mktg.*, 90 F.Supp.2d 401, 419 (S.D.N.Y.2000). The limitations period on a tortious interference claim begins to run on the date injury is sustained, *Cary Oil*, 90 F.Supp.2d at 419 n. 106, which Plaintiffs allege (again) occurred when Defendants "fraudulently obtain[ed]

the execution of the October 19, 1992 By-Laws." (WC ¶ 68; JC ¶ 127). Assuming that Plaintiffs' claims accrued on October 19, 1992, the limitations period expired on October 19, 1995—almost five years before Weizmann filed its suit on October 16, 2000 and almost six years before the Jungs instituted their action on July 30, 2001.

Under New York law, "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 44 N.Y.2d 442, 448–49, 377 N.E.2d 713, 716, 406 N.Y.S.2d 259, 262 (1978). "[T]he burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." 44 N.Y.2d at 450, 377 N.E.2d at 717, 406 N.Y.S.2d at 263. "Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances." *Id.*

The Court reaches no conclusion as to compliance with the applicable limitations periods at this time. "It is not possible or appropriate ... on the present motion addressed to the pleading, presenting us as it must with only a skeletal record, to determine whether [Plaintiffs] met [their] obligation of due diligence when [they] instituted the present action ...." 44 N.Y.2d at 451, 377 N.E.2d at 717, 406 N.Y.S.2d at 264.

**F. Conversion**

Defendants argue that Plaintiffs' conversion claim is precluded because "Plaintiffs ... did not have legal ownership or an immediate superior right of possession to [the Foundation's] funds under New York law" and because "[u]ntil Mrs. Gelman's

death, [the] Board—not Defendants—at all times had the right and authority to designate and remove second beneficiaries." Def. Mem. at 12, 13. Plaintiffs contend that their "future interest in their respective intended shares of [the Foundation's] funds is sufficient to state a claim for conversion." Pl. Opp. at 17.

■■■■■ "Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of Am. v. Housing Auth. of the City of El Paso, Tex.,* 87 N.Y.2d 36, 44, 660 N.E.2d 1121, 1126, 637 N.Y.S.2d 342, 347 (1995) (citations and internal quotation marks omitted). "In order to maintain an action for conversion, a plaintiff must demonstrate (1) plaintiff's legal ownership or immediate superior right of possession to property; and (2) defendant's unauthorized interference with plaintiff's ownership or possession of such property." *Republic of Liberia v. Bickford,* 787 F.Supp. 397, 402 (S.D.N.Y.1992). Section 243 of the Restatement (Second) of Torts, states that "[o]ne who is subject to liability for conversion to a person in possession of a chattel, or to one entitled to its immediate possession, is also subject to liability to a person entitled to the future possession of the chattel for harm caused to such person's interest in it." In *Goebel v. Clark,* 242 A.D. 408, 275 N.Y.S. 43 (4th Dep't 1934), the Appellate Division held that injury to plaintiff's reversionary interest in personal property was "sufficient . . . to establish a cause of action, though not strictly in conversion, against the defendant." 242 A.D. at 411, 275 N.Y.S. at 46. The comment to New York Pattern Jury Instruction 3:10, entitled "Intentional Torts—Interference with Person or Property—Conversion—Wrongful Taking," states, in pertinent part:

> Conversion is concerned with possession, not title, and the plaintiff need only have a possessory right to the chattel that is superior to that of the defendant. Either actual possession or the right to immediate possession is sufficient, and a person entitled to future possession may also recover for the injury to her or her reversionary interest though not strictly in conversion.

*New York Pattern Jury Instructions—Civil,* PJI 3:10 cmt. (cum.supp.2002) (internal citations omitted.) It appears at this stage that Plaintiffs have adequately plead a conversion claim premised upon their future interest in the Foundation's funds pursuant to the August 10, 1989 By–Laws and/or the August 13, 1991 By–Laws.[26]

## G. Tortious Interference with Contract

■■■ "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001).

Defendants challenge Plaintiffs' tortious interference with contract claims on the ground that Plaintiffs cannot plead the existence of a valid contract. Plaintiffs allege that the "Last Valid By–Laws, together with Anturia Foundation Charter and all express and implied understandings between the Gelmans and the Anturia Foundation, constituted a valid, enforceable contract between the Gelmans and the Anturia Foundation." (WC ¶ 66, JC ¶ 125). Defendants argue that, "[u]nder

---

26. As discussed *infra.,* the Court does not here determine whether the Anturia by-laws formed a "valid enforceable contract" as alleged in the Complaints. (WC ¶ 60, JC ¶ 117).

New York choice of law rules. Liechtenstein law would govern whether any contract existed...and ·pursuant to Liechtenstein law, no such contract exists." Def. Mem. at 15.

Assuming· *arguendo* that Liechtenstein law applies, the Court is not in a position, at this time, to resolve the issue of whether or not a contract existed. That is, while the Defendants state that, "[t]here was no contract between the Gelmans and Anturia which would allow a third party to claim any rights," (Burger Aff. ¶ 26), neither party has yet made a convincing presentation. *See e.g., Walpex Trading Co.· v. Yacimientos Petroliferos Fiscales Bolivianos,* 756 F.Supp. 136, 143 (S.D.N.Y.1991) (Denying summary judgment where a single affidavit from a foreign lawyer, "failed to convince the Court that Bolivian courts would necessarily deny plaintiff any relief in a case in which the plaintiff's allegations, if proven, may establish that defendant in bad faith induced plaintiff to rely on it promised award of the contract.")

### H. Tortious Interference with Expectancy of Inheritance

 Defendants argue that "New York does not recognize this tort at all." Def. Mem. at 18. Plaintiffs respond that tortious interference with expectancy of inheritance is an "emerging tort" in New York, which "has long afforded redress against those who, by fraud or other wrongdoing, deprive others of an expected inheritance." Pl. Opp. at 19.

"New York ... has not recognized a right of action for tortious interference with prospective inheritance." *Vogt v. Witmeyer,* 87 N.Y.2d 998, 999, 665 N.E.2d 189, 190, 642 N.Y.S.2d 619, 620 (1996) (affirming dismissal of complaint alleging, *inter alia,* tortious interference with prospective inheritance). As a result, Plain-

tiffs' claim for tortious interference with prospective inheritance is dismissed.

### I. RICO—18 U.S.C. § 1962(c)

The Complaints allege that, beginning in 1990 or 1991:(1) "Neschis and Littman engaged in a scheme to defraud Mrs. Gelman designed to gain control over her substantial wealth and to divert her money and property to their personal use and benefit;" (2) "[i]n furtherance of the fraudulent scheme, Neschis, Mrs. Gelman's attorney, and Littman, Mrs. Gelman's close personal companion, assumed control over Mrs. Gelman's financial affairs, including her estate plan and the ... Foundation ... and created fraudulent documents purporting to carry out Mrs. Gelman's intent but which actually furthered the fraudulent scheme;" and (3) "[t]hrough their acts of fraud and concealment, Neschis and Littman became Mrs. Gelman's sole advisors and caretakers, and thereby cemented themselves as the exclusive custodians of Mrs. Gelman's worldwide assets for the purpose of converting those assets to their personal use and benefit"—in violation of the civil RICO laws. (WC ¶¶ 78–79; JC ¶¶ 138, 140, 142). Defendants counter, among other things, that: (1) Plaintiffs have failed to plead the requisite predicate acts of "racketeering activity" (18 U.S.C. § 1961(1)), Def. Mem. at 18–19, 22; (2) Plaintiffs have failed to plead a "pattern" of racketeering activity (18 U.S.C. § 1962(c)), Def. Mem. at 18–21; and (3) Plaintiffs were not injured "by reason of" a RICO violation involving Defendants (18 U.S.C. § 1964(c)), Def. Mem. at 21–22.

 To state a civil claim for damages under RICO, "a plaintiff has two pleading burdens." *Moss v. Morgan Stanley,* 719 F.2d 5, 17 (2d Cir.1983). First, a plaintiff must establish: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4)·of 'rack-

eteering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." [27] *Id.* Second, a plaintiff must allege "causation," *i.e.,* that he or she was "injured in his [or her] business or property by reason of a violation of section 1962." *Id.* These "requirements ... must be established as to each individual defendant." *DeFalco v. Bernas,* 244 F.3d 286, 306 (2d Cir.2001); *see also United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).").

### 1. RICO Elements

#### a. Racketeering Activity

"Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include a variety of federal and state crimes including, *inter alia,* murder, kidnaping, gambling, arson, robbery, bribery, extortion, wire fraud, and mail fraud. 18 U.S.C. § 1961(1). A plaintiff must plead at least two acts, *i.e.,* "predicate acts," of racketeering activity. 18 U.S.C. § 1961(5); *see also Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985) ("The implication is that while two acts are necessary, they may not be sufficient.").

■■■■ The Complaints allege that Littman committed one act of wire fraud in

1992, in violation of 18 U.S.C. § 1343, and numerous acts of larceny by embezzlement and larceny by false promise, in violation of New York Penal Law § 155.05. *See* WC ¶¶ 86–89; JC ¶ 149. But as Defendants correctly contend. "[t]he only predicate acts Plaintiffs allege that Littman agreed to, or allegedly committed, were the predicate acts of larceny and the transmission [by wire] of the December 15, 1992 memo...." Def. Mem. at 22, n. 19. Neither larceny by embezzlement nor larceny by false promise falls within the RICO statutory definition of racketeering activity.[28] *See* 18 U.S.C. § 1961(1); *see also Segarra v. Messina,* 153 F.R.D. 22, 28 (N.D.N.Y.1994) (holding that larceny is not a "viable predicate act under the RICO statute."); *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk,* 793 F.Supp. 1114, 1136 (E.D.N.Y.1992) (" 'Larceny' is not listed in [s]ection 1961(1)(A) among the state offenses that may constitute acts of racketeering.")

Nor do Plaintiffs cite persuasive legal authority to support the argument that "false procurement" of documents constitutes a RICO predicate act. Plaintiffs have failed to plead two predicate acts of racketeering activity by Littman and their § 1962(c) claim cannot stand against him.

Plaintiffs have met their burden of pleading two or more predicate acts of racketeering activity by Neschis. Indeed, the Complaints allege that Neschis committed four predicate acts of mail fraud in violation of 18 U.S.C. § 1341.[29] *See* WC

27. Most pertinent to the resolution of the present motion are the RICO claim elements principally challenged by Defendants, namely, "racketeering activities" and "pattern."

28. The state law crimes which constitute predicate acts are those acts or threats "chargeable under State law and punishable by imprisonment for more than one year," which involve "murder, kidnaping, gambling,

arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical." 18 U.S.C. § 1961(1)(A).

29. For the reasons stated above. Plaintiffs' allegations of larceny by Neschis do not constitute predicate acts of racketeering activity.

¶¶ 85–89; JC ¶ 149. And, "Plaintiffs have made no allegation of wrongdoing against Diamond," who is named as a defendant "solely in her capacity as a trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997...." Pl. Opp. at 1, n. 1.

### b. Pattern

Defendants also argue that Plaintiffs have failed to plead a "pattern" of racketeering. Def. Mem. at 19. Plaintiffs respond that "[a]llegations that a fiduciary engaged in numerous transactions of diversion of funds, all related to the overall purpose of stealing and diverting the funds, satisfy the requirement of a 'pattern of racketeering activity.'" Pl. Opp. at 21.

 To establish "pattern," a plaintiff must allege facts tending to show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.'" *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir.1999).

The Complaints fail to plead that Neschis' alleged predicate acts constitute either a closed-ended or an open-ended pattern. "Closed-ended continuity is demonstrated by predicate acts that amount to continued criminal activity by a particular defendant." *Id.* Several factors may be considered, including, *inter alia:* "the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) (citations omitted). To show closed-ended continuity, a plaintiff must allege "a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. The Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time.'" *Cofacredit*, 187 F.3d at 242.

Defendants argue that Neschis' alleged predicate acts after 1992 may not be considered "[b]ecause replacing Plaintiffs as second[ary] beneficiaries was 'effectively accomplished' when the 1992 By-[L]aws replaced the 1991 By-[L]aws...." Def. Mem. at 19. Plaintiffs state that the "goal of the purported scheme—control over Mrs. Gelman's wealth—will not be accomplished until the New York Trust, Littman and Diamond receive their distributions of Anturia funds," Pl. Opp. at 22, *i.e.*, the scheme "began in 1992 and continued at least through the completion of the Liechtenstein arbitration and the receipt of the proceeds of the fraud by the New York Trust." *Id.* at 22–23. Assuming *arguendo* that each of Neschis' four (alleged) acts of mail fraud, beginning on April 30, 1992 and ending on July 16, 1999, is relevant to assessing continuity, Neschis' actions lasted approximately seven years.

 At the same time, "a scheme's duration alone is not dispositive." *Pier Connection*, 907 F.Supp. at 78; *see also Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 446 (S.D.N.Y.1999) ("While, when taken in isolation, the time period of the alleged racketeering conduct may support a finding of closed-ended continuity, such a finding is not automatic in light of the other factors to be considered."). In *Feirstein v. Nanbar Realty Corp.*, 963 F.Supp. 254, 260 (S.D.N.Y.1997), the Court held that plaintiffs' allegations of four predicate acts committed over a three-year period were insufficient to establish closed-ended continuity because "an average of one act per

year is a sporadic event" and plaintiffs alleged "nothing more than a single alleged scheme with a single, wrongful, narrow goal...." *Id.* at 260. As in *Feirstein*, none of the (other) indicia of closed-ended continuity—*i.e.* a large number and variety of predicate acts, a large number of either participants or victims, and the presence of separate schemes—is present in this case. The Complaints plead four predicate acts of mail fraud, committed by one participant (Neschis) against a limited number of victims (Weizmann and the Jungs) in furtherance of a single fraudulent scheme (to gain control of Mrs. Gelman's assets). "Such a discrete and limited scheme is insufficient to support closed-ended continuity." *Lopresti v. Merson*, 00 Civ. 4255(JGK), 2001 WL 1132051, at *13 (S.D.N.Y. Sept. 21, 2001). And, Plaintiffs' allegations that Neschis committed larceny do not help Plaintiffs' cause. "RICO continuity is measured by RICO predicate acts, not by actions that, while wrongful, are not statutory predicates for a RICO violation." *Vicon Fiber Optics Corp. v. Scrivo*, 201 F.Supp.2d 216, 221 (S.D.N.Y. 2002).[30]

### J. RICO Conspiracy—18 U.S.C. § 1962(d)

Defendants argue (correctly) that "[b]ecause Plaintiffs' substantive RICO claim fails, Plaintiffs' claim of conspiracy to commit a violation of 18 U.S.C. § 1962(c), pursuant to § 1962(d), must also fail."

Def. Mem. at 22. *See Vicon*, 201 F.Supp.2d at 221 (dismissing RICO conspiracy claim "because the underlying substantive RICO cause of action has been dismissed."); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y. 1996) (holding that plaintiff's "failure to adequately plead facts that would satisfy the pleading requirements of §§ 1962(a), 1962(b) or 1962(c) necessarily dooms any claim she might assert arising under § 1962(d).")

### K. Constructive Trust

The Jungs allege that they are entitled to a constructive trust on Defendants assets because Defendants "took advantage of or otherwise abused" the confidential fiduciary relationship as trustees of the Inter Vivos Trust and the Testamentary Trust.[31] (JC ¶¶ 178–79). Defendants contend, *inter alia*, that the Jungs fail to "allege that Defendants made them a promise or their reliance on said promise." Def. Reply at 8.

A constructive trust is an equitable remedy designed to "prevent unjust enrichment, although unjust enrichment does not necessarily implicate the performance of a wrongful act." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir.1999). "New York law generally requires that a party establish four elements before a constructive trust may be imposed: (1) a confidential or fiduciary rela-

---

**30.** "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit*, 187 F.3d at 242. Plaintiffs allege that the Defendants' scheme to gain control over Mrs. Gelman's assets "began in 1990 or 1991" and that the scheme "continues to the present day." WC ¶ 82. This conclusory allegation is insufficient. "A simple statement

that the 'scheme continues to date,' without more, does not suffice [to allege open-ended continuity]." *Pier Connection, Inc. v. Lakhani*, 907 F.Supp. 72, 76 (S.D.N.Y.1995).

**31.** Only the Jung Complaint alleges claims for constructive trust. (JC ¶¶ 172–80). Weizmann, however, has indicated that "[i]n the event leave to replead is granted, [it] would assert a similar claim for constructive trust." Pl. Opp. at 24, n. 18.

tionship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *ESI, Inc. v. Coastal Power Production Co.,* 995 F.Supp. 419, 436 (S.D.N.Y.1998). While these elements serve as important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited. *See Pagliai v. Del Re,* 99 Civ. 9030, 2001 WL 220013, at *6 (S.D.N.Y. Mar. 7, 2001).

■ "However, even given the Court's flexibility, plaintiffs must at least show a promise and a transfer of property in reliance thereof." *Weber v. Multimedia Entertainment, Inc.,* 97 Civ. 0682(PKL), 1998 WL 2550, at *5 (S.D.N.Y. Jan. 5, 1998). Here, the Jungs have failed to allege either a promise or a transfer of any property in reliance on a promise. *See id., see also Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1474 (S.D.N.Y.1992) ("Without transfer of property in reliance of a promise or agreement, there cannot be a constructive trust."); *Caballero v. Anselmo,* 759 F.Supp. 144, 147 (S.D.N.Y.1991) ("... plaintiff must at least show a promise and a transfer of property.")

## L. Injunctive Relief

The Jungs' assert that they are "entitled to a preliminary and permanent injunction against all of the Defendants enjoining and restraining the Defendants from exercising any dominion or control ... over any of the assets of the ... Foundation and/or the estate of Natasha Gelman." [32] (JC ¶ 171). The Jungs seek a permanent injunction "enjoining all [D]efendants from using or transferring any part of the assets received from the ... Foundation directly to any person or entity, other than to [the Jungs], until [the Jungs] ha[ve] received their proportionate share of the assets in the ... Foundation at the time of the death of Mrs. Gelman." (*Id.* at 36). Plaintiffs contend that "[t]he Jungs' claim for injunctive relief is necessary to insure that [D]efendants' elaborate scheme to defraud the Gelmans' rightful beneficiaries does not continue." Pl. Opp. at 24.

Defendants argue, among other things, that the Jungs' claim for injunctive relief should be dismissed "because the Jungs fail to demonstrate that irreparable harm exists or that money damages would be insufficient." Def. Mem. at 23.

■ To obtain a preliminary injunction, a party must establish: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Random House, Inc. v. Rosetta Books LLC,* 283 F.3d 490, 491 (2d Cir.2002). "The standard for obtaining a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must actually succeed on the merits of the case, rather than merely demonstrate that success is likely in a future proceeding." *Old Republic Ins. Co. v. Hansa World Cargo Serv.,* 170 F.R.D. 361, 385 (S.D.N.Y.1997) (citations and internal quotation marks omitted). To satisfy the first prong of this test, the "potential injury ... justify[ing] the granting of injunctive relief ... must be irreparable; that is, it must be the kind of injury for which an award of money cannot compensate." *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 12 (2d Cir.1982).

■ The Jungs seek monetary relief. *See* Pl. Opp. at 24 ("Absent injunctive relief, [D]efendants will continue to exercise

---

**32.** The Weizmann Complaint does not state a claim for injunctive relief.

dominion and control over the [Foundation's] assets."). The Jungs' claimed injury "is precisely the type of harm which injunctive relief is not designed to remedy." *Old Republic*, 170 F.R.D. at 385. "There is absolutely no basis in law for an injunction to issue to remedy [their] alleged monetary damages [and] repleading this claim would be futile." *Id.* at 386.[33]

## V. Conclusion and Order

For the foregoing reasons, Defendants' motion to dismiss [14–1] is granted in part and denied in part and Plaintiffs' motion for a preliminary injunction [23–1] is denied. Plaintiffs' application for leave to amend (*see* Pl. Opp. at 5, n. 4) is granted provided the (alleged) facts so warrant. Plaintiffs shall serve and file their claims, amended in accordance with this Order, by October 25, 2002.

˙Counsel are directed forthwith to appear at a settlement/scheduling conference with the Court on November 15, 2002, at 2:30 p.m., in Courtroom 706 of the U.S. Courthouse, 40 Centre Street, New York, New York. ʼThe parties are directed to engage in good faith settlement negotiations prior to the conference with the Court.

---

**33.** Plaintiffs' motion for a preliminary injunction "pending the Court's decision on [D]efendants' currently pending motion[ ] to dismiss," is likewise denied for failure to establish irreparable harm. *See, Sturm, Ruger & Co. v. Chase Manhatten Bank,* No. 93 Civ. 73165(SHS) 1994 WL 191512 at *3 (S.D.N.Y. May 17, 1994).